# Supreme Court of Florida

_____

No. SC12-2469
_____

**DALE GLENN MIDDLETON,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[March 9, 2017]
**<u>REVISED OPINION</u>**

PER CURIAM.

Middleton's motion for rehearing is hereby granted. We substitute the following revised opinion for our previous opinion issued October 22, 2015.

On August 6, 2012, a jury found Dale Middleton guilty of first-degree premeditated murder for the killing of Roberta Christensen, first-degree felony murder with a weapon, burglary of an occupied dwelling while armed, and dealing in stolen property.[1] The jury voted 12-0 to impose the death penalty. The trial court followed the jury's recommendation and sentenced Middleton to death.

_____

1. The State <u>nolle prossed</u> the third-degree grand theft charge of the indictment.

Middleton now appeals his convictions and sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons set forth in this opinion, we affirm Middleton's conviction of first-degree murder and uphold his death sentence.

## I. Statement of the Case and Facts

Roberta Christensen, as well as her husband of thirty-one years, lived in a trailer across the street from Middleton. On July 1, 2009, Mr. Christensen went to New Jersey to visit the couple's son. Before her husband left, they bought mobile phones that allowed them to use a walkie-talkie mechanism to communicate while they were apart.

Middleton lived in a trailer with Garrett Wade Fowler, Kenneth Wade Sullivan and Sullivan's girlfriend, Haleigh Zinker. On occasion, Middleton would visit the victim at her home and would sometimes borrow money and cigarettes from her. On the morning of July 27, 2009, Middleton went over to the victim's trailer while she was preparing to go to the bank. After he left, she realized that she had left approximately $400 in tip money out, and suspected that Middleton had seen it. She deposited the money into the bank that afternoon. When the victim returned from the bank she noticed that someone had attempted to remove the screen from the window by her front door.

On the morning of July 28, 2009, Middleton rode around with his girlfriend's roommate, Steve Britnell, for a period of time looking for drugs. The two eventually found methamphetamine around twelve or one o'clock that afternoon. They returned to Middleton's trailer and shared the methamphetamine. At this time, Garrett Wade Fowler and his girlfriend were also at the trailer. At approximately 4:30 p.m., Fowler and Britnell decided to go to Walmart to "boost." Middleton declined to go, stating that he had business to take care of, that someone owed him some money, and that he needed to take a shower.

While Britnell and Fowler were gone, Middleton took a knife from the sink of his trailer and went over to the victim's home. While in the victim's kitchen, he asked her for money. When she refused and attempted to push him out of the trailer, he attacked her with the knife. Christensen was alive and moving erratically as she was dragged from the kitchen area to the bedroom. Once in the bedroom, Middleton cut Christensen's throat. Before leaving her home, Middleton stole her flat-screen television and power cord and carried the television across the street to his trailer. There, he washed his hands in the kitchen sink, changed his clothes, but kept his boots on. He placed the bloody clothes in a bag with the murder weapon.

When Fowler and Britnell returned to Middleton's trailer, Middleton was there with Chris Jenkins, Kenneth Wade Sullivan and Sullivan's girlfriend. There

was a flat screen television in the kitchen with a blanket covering it. At this time, Middleton had already showered and his hair was still wet. He stated that the person that owed him money had given him the television as payment.

After Jenkins and Sullivan left, Fowler was sitting on the porch as Middleton stood at the door. Fowler noticed that Middleton had a red substance on his boots, which Middleton claimed happened because he got something out of the dumpster. Later, Britnell and Middleton drove around in Britnell's black Pontiac to two different pawn shops trying to sell the victim's television; both pawn shops were closed. They both then got on the phone and began to call around to see if they could find someone who wanted to purchase the television.

At approximately 5:30 p.m., Middleton called Christopher Jenkins to his home. Middleton asked Jenkins to bring drugs with him. When Jenkins arrived at Middleton's trailer, Middleton asked Jenkins for assistance in selling the television. After Jenkins took a photo of the television, he and Middleton went into the bedroom where Middleton crushed and consumed two Roxicodone pills, saving one pill for later.

Mrs. Christensen's husband had last spoken to her on July 28, 2009, around 2:50 p.m. He watched a movie and fell asleep from approximately 4 p.m. to 6:40 p.m. When he woke up he was surprised that his wife had not called him; he repeatedly attempted to contact his wife on the walkie-talkie phone, to no avail.

He also left a message on the home's voicemail. Mr. Christensen called the couple's other son who lived near the victim's home and asked him to check on his mother.

When the Christensen's son and his wife arrived at his parents' home, he noticed Mrs. Christensen's car parked in its usual spot. The trailer door was unlocked and the son went inside. When the son walked into the kitchen, he saw a big puddle of blood on the kitchen floor. Next to the puddle of blood he saw a yellow broom with a sharp edge. He followed the path of blood to a closed bedroom door. He opened the door and saw his mother's dead body on the floor. He heard his father on the walkie-talkie calling out for him and his mother. He went outside to call the police. He stopped his wife from entering the trailer. While on the phone with the 911 dispatcher, he went back into the trailer to confirm that his mother was not breathing.

Randy Ammons helped Middleton sell the television to his brother, Rolland Ammons. When Middleton went to Randy Ammons' house, he said that he had just taken a shower and did not want the dog to jump on him. A little after 7 p.m., Middleton, in a vehicle driven by Wade Fowler, followed Randy Ammons to Ronnie Ammons' house to sell the television. Fowler stayed outside by his car while Middleton took the television, covered with a comforter, inside and sold it to Rolland for $200. At some point earlier, while riding around trying to sell the

television, Middleton placed the bag with the bloody clothes and the murder weapon inside of a dumpster.

After selling the television, Britnell drove Middleton to a gas station, where Middleton purchased cocaine from someone in a truck. They consumed some of the drugs while in the car. Soon thereafter, the serpentine belt on the car broke and Britnell drove to a relative's house to have it fixed. While the car was being fixed, Middleton walked a few hundred yards to a local bar, Brewskis, and called Britnell to pick him up once the car was fixed. When Middleton got back to the car, he was really upset and was crying while he was on the phone with his girlfriend and said, "I'm sorry." The two drove back to the trailer park where Middleton lived. When they arrived, there were police cars in the area. Not wanting to get too close to the police officers, the two turned off at someone else's house, where they got out of the car and stood in the yard.

Later that evening, officers found Middleton at the residence of Darrell Dubel. When the officers arrived, Britnell's car was there. At this time, Middleton was barefoot and had placed his boots and socks in Britnell's trunk. Officer John Rhoden asked Brandon Jenkins, Britnell and Middleton to come to the Sheriff's Office for questioning. Middleton's boots were later recovered from the trunk and were found to have the victim's blood on them. While in custody, Middleton confessed. The bloody clothes and the murder weapon were never discovered.

## A. Middleton's Confession

During the trial, the State played Middleton's interview videos for the jury, including the fifth and final video where Middleton ultimately confessed to the murder. Detective Faulkner and Assistant State Attorney Ashley Albright were present during Detective Maerki's questioning of Middleton. The recording of the first interview, which was conducted in Detective Maerki's office, could not subsequently be retrieved. As a precautionary measure, the second and third interviews were conducted using the computer equipment located in Detective Faulkner's office. Maerki read Middleton his rights, as detailed on a Miranda[2] card. Maerki detected an odor of alcohol on Middleton, and also noticed that his eyes were bloodshot and watery. He was surprised that Middleton did not have slurred speech and that his coordination was fine. He stated that Middleton seemed to be fully aware of everything that was happening during the interrogation.

Middleton told Maerki that everything happened so fast that he never checked to see if the victim had any money. He stated that he thought that the victim ended up in the hallway, and that he did not remember cutting her throat. He stated that after the murder, he did not bathe, and only washed his hands. He admitted that he acted alone. He told the police the location of the dumpster where

---

2. Miranda v. Arizona, 384 U.S. 436 (1966).

he threw the bag with his clothes and the murder weapon. He stated that he kept his boots on and put them in the trunk of Steve Britnell's small black car. He admitted to selling the television later that night to Rolland Ammons for $200. He additionally admitted that he used the same $200 to purchase more drugs.

## B. Forensic Testimony

Crime scene technician Jackie Moore assisted Detective Bradley at the crime scene. She testified that there was no evidence of a struggle in the living room area. She recalled that there was a void in the dust on a television stand in the living room indicating that there was previously a television and remote there. She testified that there were bloodstains on the dining room table and chairs that led toward the master bedroom. The bloodstains on the wall of the bedroom indicated that at some point the victim had been standing and had stepped in blood. On the floor near the wall next to the refrigerator and the dining room table, there was blood with drag marks and some pooling of blood. The drag marks indicated that the victim was alive and moving erratically as she was dragged from the kitchen area to the bedroom. There was blood with drag marks in the doorway of the master bedroom. There were bloody shoe impressions from the master bedroom to the kitchen.

The victim had a gaping wound in her throat. The medical examiner testified that there were several passes like a sawing motion with a sharp

instrument to create the margin of the wound. The blood stains indicated that the victim's carotid artery was not cut until she got into the bedroom. Her hands and shirt were saturated with blood. She also had blood running down her abdomen that soaked into the waistband of her pants. The amount and pattern of blood on the victim's waistband indicated that she may have been sitting up slightly or halfway when she received the neck injury. The victim's shirt was pulled upwards toward her neck, which is consistent with being dragged.

The laceration to the victim's throat produced significantly more blood than was seen in the blood trail through the kitchen. The victim had a bruise on her cheek that was consistent with the tread and design of Middleton's boots. The victim had bruises and a cut to her face, a puncture and stab wounds on her chest, neck, ear, and arms. The bloody shoeprints were well defined closer to the bedroom and became faint as they continued down the hall. The victim's son's shoes were tested and eliminated as the shoes that caused the bloody shoe impressions. Moore testified that this indicated that the blood was likely dried by the time the victim's son found her. There were various items located close to the victim's body, which indicated that she was grabbing for things during the struggle. The victim had bloody injuries to her arms and wrists. She had defensive wounds that indicated that she was trying to get away from someone who had a knife. None of the injuries to the victim's extremities would have killed or

incapacitated her. The autopsy revealed that the neck injury occurred toward the end of the attack. Following the neck injury, the victim could have been conscious for ten to twenty seconds, and alive for minutes after losing consciousness.

On the kitchen floor of Middleton's residence, there was a washed-out shoe impression that was similar to those found inside the victim's residence. This print tested positive for blood, but no DNA profile could be obtained. The medical examiner found blood on the sink of the only bathroom in Middleton's trailer, but no DNA profile could be obtained. There was blood beside the dresser in Middleton's bedroom, but the DNA profile was determined to be inconclusive. A different bloodstain in Middleton's room matched the victim's DNA on four of thirteen points. The probability that a randomly selected Caucasian person could match the same DNA profile at these four locations is one in 41,680.

Donna Lee and Rolland Ammons' fingerprints were the only prints found on the victim's television. Middleton's fingerprints were not found inside the victim's residence. There was no evidence that the trailer had been ransacked or that the victim's things had been rifled through. Moore explained that the vanity in the victim's bedroom had blood spatter on the outside, but not the inside, indicating that the door to the cabinet of the vanity was closed during the attack. Inside the cabinet, there was a purse that appeared to have been thrown in there. There was

evidence of blood spatter on the purse and also blood inside of the purse. The

purse was empty, and there were no fingerprints found on the purse.[3]

## C. Penalty Phase

During the penalty phase, the defense presented testimony from Dr. James

D. Barnard, and the State presented testimony from Dr. Deborah Leporowski.[4]

The defense's court-appointed mitigation investigator, Joe Parish, also testified, as

did Middleton's sisters.

## 1. Psychological Witnesses Testimony

Dr. Barnard assisted the defense in formulating mitigating evidence and

conducted a mental health evaluation of Middleton. His findings indicated that

Middleton underreported the type of drugs he abused and the frequency of their

use. Dr. Barnard determined that Middleton began abusing painkillers after being

prescribed the medications following an accidental fall. He also determined that

Middleton began smoking marijuana between the ages of ten and thirteen. He

described the onset of cocaine use at age twenty-five, ceasing at age thirty.

Additionally, Middleton told Dr. Barnard that he had used methamphetamine once

a year since he was twenty-eight years old. This statement conflicted with his

---

3. During the guilt phase, the defense rested without presenting a case-in-chief.

4. They testified consistently with their respective testimony provided at the hearing on Middleton's pretrial motion to suppress his confession.

assertion during his police interview that the day of the murder was the first time he had ever used methamphetamine. Dr. Barnard testified that Middleton reported briefly being medically treated for attention deficit hyperactivity disorder (ADHD). Dr. Barnard characterized ADHD as symptomatic of difficulty with impulse control, difficulty regulating behavior to standards or norms, high-rate motor activity, and difficulty focusing attention.

Dr. Barnard also found that Middleton was possibly exaggerating his symptoms, which may sometimes be viewed as a cry for help. Dr. Barnard found it quite significant that Middleton's personality type is known to have problems with repressed anger and hostility and that persons with this condition are sometimes able to control their anger but sometimes have anger outbursts that are difficult or impossible for them to control. Equally significant, opined Dr. Barnard, is that individuals with this personality type have real problems responding to authority and taking direction and often accept little or no responsibility for their behavior. Dr. Barnard concluded that Middleton could not conform his conduct to the requirements of the law on the day in question and that his substance abuse on the date of the murder would have likely impaired anyone's psychological controls, even someone who had no difficulty with impulse control.

On cross-examination, Dr. Barnard admitted that he did not review all of the records in this case, i.e., the depositions of people close to Middleton, his arrest

and jail records, and his confession to the murder. Dr. Barnard conceded that Middleton is not mentally retarded. The State questioned Dr. Barnard about the report that was conducted by Dr. Landrum in August 2009 which found Middleton's IQ to be 72. Dr. Barnard testified that Middleton informed him that he did not give his best effort on the IQ test conducted by Dr. Landrum. When Dr. Barnard administered the Wechsler Adult Intelligence Scale-IV (WAIS-IV) test in September 2011, he determined that Middleton's full scale IQ was 83. Dr. Barnard determined that Middleton was not malingering during the exam he administered. He stated that he was aware that Middleton was administered the WAIS-IV test for a third time in this case by Dr. Riordan in March 2012.

Dr. Riordan's March 2012, evaluation indicated that Middleton's IQ score was 75. Dr. Barnard would have expected Middleton's IQ score to be higher if all other factors were stable. This lower score could be an indication of various factors including Middleton being under the weather or malingering. There were no indications that Middleton was ever separated from the general population in prison due to any mental health issues. Dr. Barnard admitted that Middleton slit his wrists in a holding cell and did so in an attempt not to be extradited back to a facility in Georgia.

Dr. Deborah Leporowski testified for the State. She stated that in order to prepare for her testimony, she reviewed the reports, previous testimony, and

- 13 -

depositions of Doctors Barnard and Riordan and the report of Dr. Landrum. She also reviewed the police reports in this case, transcripts, witness interviews, letters that Middleton wrote while he was in jail, and Department of Corrections records. She also interviewed Middleton. Dr. Leporowski maintained that Middleton's IQ scores are illogical with an initial score of 72, a score of 83 two years later and then months later receiving a score of 75. Dr. Leporowski opined that a score of 83 is likely Middleton's actual IQ score. Dr. Leporowski diagnosed Middleton with antisocial personality disorder, as did Dr. Barnard.

Dr. Leporowski determined that Middleton was malingering "or at least exaggerating" when taking his personality tests. Dr. Leporowski found no history of mental illness in Middleton's records or in her interview with him. She rejected any assertion that Middleton's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired. She opined that Middleton's upbringing did not in any way lead him to believe that those actions involving this crime were okay or were warranted in any way based on the victim's behavior. She testified that everything he told her about the day of the crimes was logical, made sense, and indicated that he was able to make decisions and choices. Dr. Leporowski further noted that Middleton appeared to remember what he did throughout the day, where he did drugs and with whom. On cross-examination, she stated that Middleton's jail records

indicated that his detox from drugs while in jail was typical and did not evidence drug dependence, but that he used them intermittently when he had access to them.

## 2. Family History Testimony

The trial court appointed Joe Parrish, a licensed private investigator, to assist the defense in developing mitigation for the penalty phase. Mr. Parrish determined that Middleton's mother abused drugs and his older siblings acted as parents to him. Middleton expressed to Parrish some depression concerning the death of his father figure, a former employer, who had died. Mr. Parrish found that Middleton was employed at a welding company for a period of time and was described by the owner as being a hard worker and very dependable. Parrish also found that marijuana use at an early age led Middleton to abuse heavier drugs. Mr. Parrish spoke with Middleton's eldest daughter, who lived in the same mobile park with her mother and younger sister. She explained that in the days leading up to the murder, she noticed that her father's physical appearance had changed and that he was abusing drugs. Parrish also described a history of domestic violence between Middleton and his girlfriend, Sabrina Jones.

Devenna Pearson, Middleton's older sister, testified on his behalf. She described their childhood as physically and emotionally painful. She explained that their mother provided for the necessities of life, such as food, clothing, shelter and basic hygiene through social security benefits that she received following the

death of her husband. She explained that she and Middleton were never required to go to school. Pearson additionally explained that she was sexually molested by her stepfather for approximately three and a half years, and that her mother was aware of the abuse but did not stop it. Her older sister found out and stopped the abuse by cutting their abusive stepfather. She recalled that she was sent away for a few months and Middleton remained in the house with their mother. She described her brother, as she knew him growing up, as outgoing, fun and someone who always tried to make everyone laugh.

Dewanna Sprowse, Middleton's eldest sister, also testified on his behalf. She explained that their mother would sell her food stamps for beer and drugs. Sprowse recalled that Middleton did not have clean clothes and fitted shoes, and that if she was not home to get her siblings up and ready for school then their mother would just tell them to go outside and play. She explained that one of her stepfathers was physically abusive to her younger siblings, including Middleton. She testified that their mother had always placed men before her children, and that she did not spend any money on holidays, birthdays, or books. She recalled Middleton being about age twelve or thirteen when he finally quit going to school.

She described Middleton, as she remembered him growing up, as a sweetheart, talented, with a good heart.[5]

### D.  Middleton's Pretrial Motion to Suppress His Confession

The defense filed a motion to suppress the defendant's confession, claiming that Middleton was too intoxicated to waive his <u>Miranda</u> rights.  The motion additionally alleged that Middleton did not possess the intellectual ability to comprehend his <u>Miranda</u> rights and that Middleton's final interview was conducted after Middleton's attorney provided the Sheriff's Office with a form invoking Middleton's constitutional right to remain silent.  The hearing on the motion took place on April 10, 2012, and June 29, 2012.

### 1.  Lay Witnesses

At the hearing on the motion to suppress, Christopher Jenkins testified for the defense.  He testified that he was disabled and was prescribed Roxicodone and Xanax.  He testified that since 2007 he would either sell or give Middleton his prescription medications.  On the day of the murder, he went to Middleton's trailer to give him some drugs and to look at the television that Middleton wanted to sell. He gave Middleton three Roxicodone pills.  Middleton snorted two of the pills while Jenkins was there.

---

5. The trial court held a <u>Spencer</u> hearing on August 24, 2012.  <u>See</u> <u>Spencer v. State</u>, 615 So. 2d 688 (Fla. 1993).  Neither the State nor the defense presented any additional evidence.

The State called Steve Britnell to testify at the suppression hearing. He testified consistently with his guilt phase testimony. Britnell recalled he and Middleton each taking one Xanax pill on the morning of the murder. He further recalled that in the early afternoon, the two shared $20 worth of methamphetamine, which Britnell described as "a little bit." He indicated that immediately following the sale of the television, he drove Middleton to a Circle K to purchase cocaine. They each consumed "a line or two" of cocaine in the Circle K parking lot. Later, Captain John Rhoden and Lieutenant Brad Stark approached them and asked them to come to the police station to give a statement. They drove to the station voluntarily.

Captain Rhoden testified that Middleton had no trouble standing or keeping his posture, did not appear to be under the influence of drugs or alcohol, spoke clearly, and did not appear to have any problems understanding what was being said to him. Lieutenant Stark testified that none of the men appeared to be off-balance. Nothing indicated that the defendant was under the influence of alcohol. On cross-examination, he stated that it would surprise him to hear that Middleton had done crystal meth, cocaine and Xanax during that day.

Detective Marty Faulkner testified regarding his interviews of Middleton. The first interview occurred on July 28, 2009, at 11:56 p.m., in his office, with another detective and Assistant State Attorney Ashley Albright present. He read

the Miranda card verbatim to Middleton, who signed, dated and time stamped it. Middleton agreed to speak with detectives, but seemed nervous. He stated that Middleton appeared to be coherent and not under the influence of any drugs; Middleton was responsive to questions and his memory appeared to be fine. The interview lasted approximately one hour. Middleton made no admissions during this interview.

Faulkner interviewed Middleton a second time, again in his office, in the early morning hours of July 29, 2009. Middleton made no admissions. The third interview lasted three minutes, and at that time Middleton claimed that Garrett Wade Fowler had committed the murder. Middleton was placed under arrest at the end of the third interview. When Faulkner returned to work, at approximately 11 a.m., Sergeant Coleman informed him that Middleton wanted to speak with him. Coleman testified and corroborated that Middleton made this request and that he relayed the request to Faulkner. This interview lasted for approximately twenty-three minutes before Middleton asked to go back to his cell. The officers then immediately concluded the interview and returned Middleton to his cell.

Faulkner further testified that on July 30, he felt obligated to check on Middleton, based on Middleton's state of mind during the interview conducted the previous day. When Faulkner arrived, Middleton was in segregation and standing at the gate of his cell. Middleton asked to speak to him, and Faulkner had

- 19 -

Middleton escorted to his office, where the final interview took place. During this final interview, after repeatedly being advised of his <u>Miranda</u> rights, Middleton confessed to murdering Roberta Christensen. On cross-examination, Faulkner acknowledged that he informed Middleton that he would have to waive his right to counsel to speak with him, and it was on the final (approximately seventh) time that Faulkner told Middleton what he would have to say in order to waive his rights, which Middleton had in fact done.

Assistant Public Defender Stanley Glenn testified that he was initially appointed to represent Middleton. He stated that on the morning of July 30, 2009, he filed an invocation of rights form with the clerk's office and that afternoon he personally delivered it to the Sheriff's Office front desk, instructing them that it be given to the lead detective investigating Christensen's death. Glenn first met with Middleton the next day and reviewed the form with him. Middleton was very depressed at this time. Glenn was concerned that Middleton needed someone to talk to and might make incriminating statements. He repeatedly informed Middleton not to make any statements without him being present. On cross-examination, Glenn acknowledged that unbeknown to him, when he filed the invocation of rights form at 11:28 a.m. and delivered it to the Sheriff's Office that afternoon on July 30, 2009, the defendant had already confessed at approximately 9:24 a.m. that morning.

## 2. Psychological Testimony

Forensic psychologist Dr. Gregory Landrum testified for the defense at the suppression hearing. He testified that he met with Middleton on two occasions in August 2009. He indicated that Middleton was competent to proceed and assist in his own defense. He determined that Middleton's IQ was 72, which is in the borderline mental retardation range. He additionally determined that Middleton reads on a fifth-grade level. Dr. Landrum was not asked to do an evaluation regarding <u>Miranda</u> competency.

On cross-examination, Dr. Landrum stated emphatically that Middleton is not mentally retarded. Dr. Landrum stated that it is possible that Middleton was faking when he was examined by Dr. Riordan, who determined that his IQ was 75, months after being examined by Dr. Barnard, who determined that it was 83. According to Dr. Landrum, administering the same tests within a year may result in a false positive.

Dr. James Barnard also testified for the defense. He prepared two reports, one of which was a psychological evaluation and the other an examination of Middleton's competency to waive his <u>Miranda</u> rights. He determined that Middleton's full scale IQ was 83. He additionally found that Middleton was not malingering. Dr. Barnard indicated that Middleton's chronic use of drugs resulted in an increased tolerance for the substances and the need for more of the

substances to get high. This factor and other factors indicate dependence on a substance as distinguished from abuse. He reported Middleton's statement that drugs make him "go, go, go" and less able to control his impulses and that Middleton told him that before he went to jail he had not slept for two nights. Dr. Barnard opined that Middleton should have been placed in a private detox facility when he was arrested. Dr. Barnard determined that at the time of Middleton's confession, he was likely withdrawing from substances and may have been under the effects of substances, at least during the time of his initial interrogation.

Dr. Barnard administered an instrument entitled "Dr. Thomas Grisso's Understanding and Appreciating Miranda Rights." Dr. Barnard testified that Middleton's total score was 13 out of 30, more than two standard deviations below the mean. He testified that although Middleton could paraphrase portions of Miranda, he "showed a very significant weakness in terms of his ability to intelligently apply knowledge of Miranda, to novel situations." Dr. Barnard stated that it was difficult to reconcile his findings during the testing with what he saw on the confession video. He explained that there is no correlation between having had Miranda warnings administered in the past and actually understanding them. He also stated that there are no validity scales for Grisso's Miranda test.

On cross-examination, Dr. Barnard stated that Middleton made general remarks indicating that he may have been malingering during the testing with Dr.

Landrum, but he did not specifically mention whether he was referring to the IQ test. Dr. Barnard's testing also indicated that Middleton may have exaggerated some of his answers to appear more maladjusted than he actually was on the date of the testing. Dr. Barnard diagnosed Middleton with antisocial personality disorder; he explained that one major feature of this disorder is that the person has a tendency to be untruthful.

Dr. Barnard further testified that before the Grisso test was administered, Middleton stated he had been advised of his rights at least five times. However, after the Grisso test, Middleton claimed that he had never been read Miranda rights, despite his extensive criminal history. After the Grisso test, Middleton told Dr. Barnard that the confession tapes had been altered. Middleton also told the doctor that methamphetamines make him think better. Middleton made comments to Dr. Barnard indicating that the police in Okeechobee violated his rights, which Dr. Barnard opined indicates that he knew what his rights were.

On redirect, Dr. Barnard stated that the conditions that Middleton was under at the time of the interrogation, plus the interrogation procedures themselves, made it more likely that he would acquiesce to the police. He also opined that Middleton did not fully comprehend his Miranda rights when he waived them.

Dr. Michael Riordan testified for the defense. Dr. Riordan was ordered to conduct a neuropsychological evaluation on Middleton. Dr. Riordan prepared a

written report, which he subsequently modified or redacted. He modified his original finding that Middleton had brain damage, and in the subsequent report he indicated that Middleton suffers from a cognitive disorder. He explained that "the cognitive disorder was the more appropriate term as a neuropsychologist to report." Dr. Riordan reviewed the reports prepared by Dr. Barnard. He agreed with Dr. Barnard's finding that Middleton was incompetent to waive his Miranda rights at the time of his interrogation, based on his borderline intellectual functioning, his cognitive disorder, and his drug use, which would have caused withdrawal at the time of the interrogation. Dr. Riordan also found that Middleton had polysubstance dependence disorder. He indicated that Middleton was not malingering. Dr. Riordan did not have Middleton perform the Grisso test, but did not disagree with Dr. Barnard's findings.

Dr. Riordan did not diagnose an antisocial personality disorder. His report indicated that Middleton had a tendency to exaggerate his problems. Dr. Riordan had previously indicated in a February 11, 2012, letter to the defense that Middleton was not initially incompetent to waive his Miranda rights, but as the interrogation progressed, he became incompetent to proceed. Dr. Riordan wrote a letter to the defense in April 2012 indicating that Middleton's drug withdrawal would have furthered his incompetence, but Dr. Riordan did not review jail records to determine whether Middleton was suffering from withdrawal symptoms. And

Middleton did not state that he was suffering from withdrawal symptoms during the interrogation. Instead, he told Dr. Riordan that the police harassed him and tampered with the confession tapes. Dr. Riordan was not aware that Middleton signed a Miranda waiver.

Dr. Deborah Leporowski testified for the State. She testified that she reviewed Dr. Landrum's report, along with the deposition reports and in-court testimony of Dr. Riordan. She also reviewed Dr. Barnard's raw data and his deposition and was present for his testimony. Additionally, she reviewed Middleton's videotaped confessions, witness statements, drug treatment records, and Department of Corrections and jail records; she also interviewed Middleton at the county jail on May 10, 2012. She did not administer the WAIS test because it had already been administered three times. She testified that the discrepancy in the scores may be due to poor motivation or deliberately underperforming on the test with Dr. Riordan. Dr. Leporowski reviewed Dr. Riordan's testing, his raw data, and his report and determined that Middleton performed in the average or above-average range on most instruments. She opined that "[t]he only areas where he demonstrated anything really in an impaired range were instruments that I felt could be accounted for by his lack of education." She observed that his scores varied on the memory tests, with delayed recall being in the impaired range and

stated, "Those are essentially the only two areas where there's anything that's not perfectly intact in the overall neuropsychological functioning area."

Dr. Leporowski stated that she would not diagnose the defendant with brain damage or a cognitive disorder. She stated there was nothing in the testing that would indicate that Middleton had trouble comprehending the Miranda warnings. Additionally, she said Middleton was candid with her about his drug use on the day of the murder and even told her that there was another drug that he used that day that Britnell did not report. He did not have difficulty reporting the information in a logical order.

In addition to not administering another WAIS-IV, Dr. Leporowski did not administer another Grisso test. She explained that one shortcoming of the exam is that it was developed for a certain jurisdiction, in 1980, and the language that the exam tests for has not been updated, despite the change in the administration of the warnings across jurisdictions. Middleton told Dr. Leporowski that he was threatened and that the confession tapes had been altered. She concluded that Middleton had the capacity to knowingly and intelligently waive his Miranda rights.

Dr. Leporowski disagreed with Dr. Riordan's testimony indicating that Middleton was suffering from withdrawal. She opined that withdrawal typically occurs seventy-two hours after consuming drugs and alcohol. She explained that

on his jail medical records, he is described as cool, cooperative, coherent, and not agitated. Dr. Leporowski spoke with the jail nurse, who indicated that they never had to use detox protocols for Middleton and that he did not need any medical attention at all. She opined that this is indicative of his intermittent, rather than his continuous, use of the substances. Dr. Leporowski found that Middleton was malingering during her evaluations of him.

On cross-examination, Dr. Leporowski acknowledged that Middleton reported doing methamphetamine before lunch, followed by eighty milligrams of OxyContin, then Roxicodone that afternoon at his trailer, and Xanax and cocaine later that evening. He also indicated that he walked down to Brewskis and consumed a couple of beers and three lines of cocaine.

The trial court denied the defense's motion to suppress Middleton's confession.

## II. ANALYSIS

### A. Avoid Arrest Aggravator

Middleton first argues that the trial court erred in finding the avoid arrest aggravator. We agree that the record does not support this aggravator as Middleton's sole or dominant motivation for the murder. This Court has consistently held that where the victim is not a law enforcement officer, "the State must show that the sole or dominant motive for the murder was the elimination of

the witness" in order to prove this aggravator. <u>Davis v. State</u>, 604 So. 2d 794, 798 (Fla. 1992); <u>see also</u> <u>Green v. State</u>, 583 So. 2d 647 (Fla. 1991); <u>Perry v. State</u>, 522 So. 2d 817 (Fla. 1988). The trial court's order on this issue lists eight facts that support this aggravator:

> (1) the defendant personally knew the victim, and went to her home without any type of disguise; (2) the defendant told Garret Wade Fowler that he was going to rob Roberta Christensen, after seeing a large amount of money inside her home the day before; (3) the defendant walked 130 feet to the victim's home in broad daylight; (4) the defendant knew that the victim was home because he could see her red car from his own home, and the car was parked directly in front of the entrance to her home; (5) the defendant knew that the victim's husband was out of town and she was home alone; (6) the victim did not pose any physical threat to the defendant; (7) the defendant armed himself with a knife from his residence, before going over to the victim's home; and (8) the victim was the defendant's neighbor, who lived almost directly across the street.

In addition, the trial court indicated that the main object of the criminal endeavor was the tip money, not the television. Finally, the trial judge said that if the victim was left alive the defendant would have been quickly arrested.

Notably, only a few of these factors have a direct bearing on or support the avoid arrest aggravator (i.e., the defendant knew the victim and did not wear a disguise and the defendant would have been promptly arrested had the victim lived and identified him). Many of the other factors listed by the trial court for this aggravator either supported Middleton's statement that he went to the victim's home to borrow money, or that he went there only intending to rob her, before

- 28 -

things became "crazy." This Court has determined that the eighth factor listed is not enough to prove this aggravator. See Foster v. State, 778 So. 2d 906 (Fla. 2000); Consalvo v. State, 697 So. 2d 805 (Fla. 1996). Additionally, the trial court's determination that Middleton's primary objective was to obtain the "easily concealable tip money," implies that pecuniary gain was a dominant motive for the killing.

In Davis, Green, and Perry, the defendants raised similar issues involving the avoid arrest aggravator. In each of these cases, this Court struck the avoid arrest aggravator even though the defendants were acquainted with the victims. In Davis, the defendant stabbed an elderly female acquaintance inside her home and stole some of the victim's belongings before exiting the residence. Davis, 604 So. 2d at 795. In Green, the defendant and his girlfriend went to the home of their landlords, a married couple, and paid them $250, under the threat of an impending eviction. Green, 583 So. 2d at 648. Green went home, changed his shirt, grabbed the largest butcher knife from his kitchen and went back to his landlord's house. When he arrived at the house, his landlord let him into the house, but was adamant about keeping Green's check. Green stabbed the husband and wife. Green returned the knife to his home and, later that night, hitched a ride from Hillsborough County to St. Petersburg and then to Ft. Lauderdale. In Perry, the defendant killed his neighbor during a robbery attempt. 522 So. 2d at 819. The

fact that the victims could have identified the defendants was not enough to demonstrate beyond a reasonable doubt that the sole or dominant motive for the murders was witness elimination.

Although the trial judge correctly stated that the avoid arrest aggravator can be supported by circumstantial evidence through inferences from the facts in the record, his reliance on cases such as Jennings v. State, 718 So. 2d 144 (Fla. 1998), and Riley v. State, 366 So. 2d 19, 22 (Fla. 1978), is not well-founded. In Jennings we upheld the finding of this aggravator based on the fact that the defendant knew the victim, used gloves, and stated that if he ever committed a robbery he would not leave any witnesses. And in Riley, we affirmed the finding of this aggravator based on the defendant knowing the victim coupled with the fact that the victim was "executed after one of the perpetrators expressed a concern for subsequent identification."

Although the trial court infers that Middleton killed the victim because he would have been arrested quickly if he had left her alive, there are no other facts that indicate that this was his sole or dominant reason for killing her, especially in the absence of other evidence indicating that Middleton was specifically concerned about eliminating the victim as a witness. Therefore, we strike this aggravating circumstance.

**B. CCP Aggravator**

Middleton next challenges the trial court's finding of the cold, calculated and premeditated aggravator (CCP).  On appeal, it is this Court's task to review the record to ensure that the trial court applied the correct rule of law for each aggravating circumstance, and if so, determine whether there is competent substantial evidence in the record to support the finding.  Willacy v. State, 696 So. 2d 695 (Fla. 1997).  We agree with Middleton that there was not competent, substantial evidence in the record to support this aggravator.

In order to establish the CCP aggravator, it is the State's burden to prove beyond a reasonable doubt that: (1) "the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold)"; (2) "the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated)"; (3) "the defendant exhibited heightened premeditation (premeditated)"; and (4) "the defendant had no pretense of moral or legal justification."  Franklin v. State, 965 So. 2d 79, 98 (Fla. 2007).  " 'CCP involves a much higher degree of premeditation' than is required to prove first-degree murder."  Deparvine v. State, 995 So. 2d 351, 381-82 (Fla. 2008) (quoting Foster v. State, 778 So. 2d 906, 921 (Fla. 2000)).  "Premeditation can be established by examining the circumstances of the killing and the conduct of the accused."  Franklin, 965 So. 2d at 98.  Further, "the evidence must prove beyond a reasonable doubt that the defendant planned or prearranged to commit murder

before the crime began." <u>Thompson v. State</u>, 565 So. 2d 1311, 1318 (Fla. 1990). "The CCP aggravator can 'be indicated by circumstances showing such facts as advance procurement of a weapon, lack of resistance or provocation, and the appearance of a killing carried out as a matter of course.' " <u>Franklin</u>, 965 So. 2d at 98 (quoting <u>Swafford v. State</u>, 533 So. 2d 270, 277 (Fla. 1988)).

In this case, the evidence is inconsistent with the murder being a product of cool and calm reflection. Although Middleton procured a knife prior to entering the victim's residence, there is no evidence that he possessed the weapon for the purpose of attacking the victim. Rather, Middleton planned to commit a robbery. In walking over to the victim's residence, Middleton did not conceal his identity. The evidence suggests that while inside the victim's residence, the victim refused Middleton's request for money. After a struggle ensued, Middleton fatally stabbed the victim. It was during the course of this struggle when Middleton formulated his intent to kill her. Middleton's behavior at the time of the murder can be aptly described as murder committed in a frenzied rage or during a heated struggle following the victim's refusal to give him money. Following this spontaneous murder—which was not carried out as a matter of course—the victim's body remained in her residence; Middleton left her home with the victim's property, to wit, her television.

Based on this evidence, we conclude that the State did not prove beyond a reasonable doubt that Middleton had a careful prearranged plan or design to murder the victim before he entered the victim's residence. Thus, we disagree with the trial court's finding that the murder was a planned event, not a sudden, impulsive act. Although following the murder Middleton washed his hands in his kitchen sink, changed his clothes, and placed his bloody clothes in a bag with the murder weapon—as noted by the trial court—these actions do not prove that he planned the murder beforehand.

We conclude that the evidence is not indicative of a heightened premeditated intent to murder. The facts in this case are similar to Castro v. State, 644 So. 2d 987, 991 (Fla. 1994), which did not involve a careful design and heightened premeditation necessary for CCP when "the record reflect[ed] that Castro planned to rob Scott." In addition, we did not find the murder in Hansbrough v. State, 509 So. 2d 1081, 1086 (Fla. 1987), to show the cold and calculated premeditation necessary for CCP where there "appear[ed] to be a robbery that got out of hand," resulting in a "frenzied stabbing." Accordingly, we conclude that there is no competent, substantial evidence to support the finding of the CCP aggravator. Therefore, we strike the finding of this aggravator.

"When this Court strikes an aggravating factor on appeal, 'the harmless error test is applied to determine whether there is no reasonable possibility that the error

- 33 -

affected the sentence.' " Williams v. State, 967 So. 2d 735, 765 (Fla. 2007) (quoting Jennings v. State, 782 So. 2d 853, 863 n.9 (Fla. 2001)); see also Diaz v. State, 860 So. 2d 960, 968 (Fla. 2003) ("We find this error harmless, however, after consideration of the two remaining aggravating circumstances and the five mitigating circumstances in this case."). Despite striking the avoid arrest and CCP aggravators, two valid aggravators remain in this unanimous death-recommendation case. The two aggravators which remain are that the murder was especially heinous, atrocious, or cruel (HAC) and that it was committed during the commission of a burglary and for pecuniary gain, which were each given "great weight" by the trial court. The trial court did not find any statutory mitigation applicable in this case.

In its sentencing order, the trial court expressly stated that any of the considered aggravating circumstances found in this case, standing alone, would be sufficient to outweigh the mitigation in total presented regarding the Christensen murder. In Smith v. State, 28 So. 3d 838, 868 (Fla. 2009), this Court held that the trial court's erroneous finding of the CCP aggravator was harmless because the sentencing order provided that "any one of the aggravators found (except the felony probation aggravator) was sufficient to outweigh the mitigating circumstances found in this case and due to the other applicable aggravating factors." Therefore, it is clear that the trial court would have imposed a death

sentence for Middleton absent the avoid arrest and CCP aggravators. Because we conclude that there is no reasonable possibility that the erroneous findings of the avoid arrest and CCP aggravators contributed to Middleton's death sentence, the errors were harmless.

### C. Proportionality

Middleton argues that without the avoid arrest and CCP aggravators, his death sentence is disproportionate as compared to cases such as Perry and Davis. After striking the two aggravators in this case, we find that the sentence of death is still proportional to similar cases.

In order to ensure uniformity in death penalty proceedings, this Court undertakes a comprehensive analysis of the aggravating and mitigating circumstances to determine whether the case falls within the category of the most aggravated and least mitigated. See Floyd v. State, 913 So. 2d 564, 578 (Fla. 2005) (quoting Anderson v. State, 841 So. 2d 390, 407-08 (Fla. 2003)). This analysis involves a thoughtful and deliberate proportionality review considering the totality of circumstances of the case and then comparing it with other capital cases with similar aggravating and mitigating circumstances. It is not a comparison between the number of aggravating and mitigating circumstances. Tillman v. State, 591 So. 2d 167, 169 (Fla. 1991) (quoting Porter v. State, 564 So. 2d 1060, 1064 (Fla. 1990)).

In this case, the jury voted twelve to zero in favor of the death penalty. The trial court weighed four aggravators against eleven nonstatutory mitigators.[6] The aggravators found are: (1) the capital felony was committed while the defendant was engaged in the commission of a burglary or an attempt to commit a burglary and the capital felony was committed for pecuniary gain; (2) the capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting escape from custody; (3) the capital felony was HAC; and (4) the capital felony was CCP. The court gave all of these aggravators great weight. The eleven nonstatutory mitigators found are: (a) the defendant has below-average or borderline intelligence (little weight); (b) the defendant suffers from attention deficit hyperactivity disorder (ADHD) (little weight); (c) the defendant has a long history of chronic substance abuse (some weight); (d) the defendant had no adult role models to guide him as a child (little weight); (e) the defendant's mother was not involved in child-rearing or supervision and was unavailable emotionally for her children (little weight); (f) the defendant had a steady history of employment until his chronic substance abuse and incarcerations made it difficult to maintain such employment (little weight); (g) the defendant had little, if any, formal education (little weight); (h) the defendant has two children (little weight); (i) the

_____

6. The trial court determined that the proposed mitigator that Middleton's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired was not proven.

defendant was subjected to chronic neglect, as well as made aware of sexual abuse that was inflicted by his stepfather upon his sister (little weight); (j) the defendant expressed remorse for his crime (little weight); and (k) the defendant exhibited appropriate courtroom behavior (little weight).

Having stricken two of the aggravators, this Court must analyze the two appropriately found aggravators of HAC and during the commission of a burglary/pecuniary gain with the nonstatutory mitigators outlined above. We begin this analysis with the trial court's weighing of both the aggravators and mitigators. Each of the aggravators was given great weight. We have in a long line of cases found the HAC aggravator to be one of the most serious in our limited statutory aggravating circumstances. See, e.g., Larkins v. State, 739 So. 2d 90 (Fla. 1999). Significantly, the trial court only gave one of the nonstatutory mitigators "some weight" and the other eleven were given "little weight." Additionally, because some of the mitigators were similar, the trial court analyzed them together. Namely, the trial court combined the analysis for the defendant's proposed mitigator of low IQ with his diagnoses of ADHD. The trial court also combined the analysis for the defendant's proposed mitigators of no adult role models, his mother being emotionally unavailable, the defendant being chronically neglected, and his sister being molested by his stepfather.

The defense argues that this case is similar to <u>Davis v. State</u>, 604 So. 2d 794 (Fla. 1992), and <u>Perry v. State</u>, 522 So. 2d 817 (Fla. 1988). However, both are distinguishable from this case. In <u>Davis</u> this Court, after striking two aggravators, did not impose a life sentence. Rather we remanded the matter to the trial judge for reconsideration of the sentence because we could not determine beyond a reasonable doubt that the trial judge would have imposed a death sentence in the absence of the two aggravators that were stricken. The trial judge ultimately determined that the remaining aggravating circumstances outweighed the mitigating circumstances and reimposed a sentence of death. We affirmed. The fact that Davis ultimately received a life sentence was not based on the elimination of aggravating circumstances but was the result of postconviction relief for ineffective assistance of counsel regarding racial comments.

This Court in <u>Perry</u> had to address a situation involving a judge's override of a jury recommendation of life. In order to uphold the imposition of a death sentence under those circumstances, we must find that no reasonable person could differ with the sentence of death. See <u>Tedder v. State</u>, 322 So. 2d 908 (Fla. 1975). While <u>Perry</u> also involved the striking of two aggravating circumstances, that factor was not the basis for the imposition of a sentence of life imprisonment. This Court made it clear that there were mitigating circumstances presented to the jury that the jury could have considered in reaching its determination of a life sentence.

Thus, we said the Tedder standard had not been met, and the case was remanded for imposition of a life sentence without parole for twenty five years.

This case is, however, more similar to Geralds v. State, 674 So. 2d 96 (Fla. 1996), where this Court found the defendant's death sentence to be proportionate under circumstances much like the ones presented here. In Geralds the jury unanimously voted for a death sentence, the same aggravators were proven beyond a reasonable doubt, and the trial court gave minimal weight to the defendant's mitigation. Geralds was a carpenter who worked remodeling the victim's trailer. Knowing that the victim's husband was out of town, he attacked her, beating her, stabbing her in the neck and stealing various items from the home. At his original sentencing, the trial court found the same four aggravators that were found in this case. We struck the CCP and witness elimination aggravators, and remanded for a new penalty phase. On appeal from the subsequent sentencing, we again struck the CCP aggravator, but found there was no reasonable likelihood of a life sentence under the circumstance of that case. 674 So. 2d at 104-05.

In both this case and Geralds, the juries unanimously recommended sentences of death. Both cases ultimately have the aggravators of heinous, atrocious, and cruel murder during the course of a felony/pecuniary gain, and the aggravators were given great weight. The mitigators in each case were nonstatutory, with exception of the age mitigator found in Geralds, and in each

- 39 -

instance they were given little or very little weight. We conclude here, as we did in Geralds, that even without the aggravators that were stricken, the trial court would have found the aggravating factors substantially outweighed the mitigating evidence. We, therefore, find that Middleton's death sentence is proportional.

### D. Order of Penalty Phase Witnesses/Continuance

Middleton argues that the trial court abused its discretion in denying his motion to continue the penalty phase to allow the family to travel to the trial and present mitigation testimony prior to the expert testimony. The defense argues that this ruling prohibited the defense from setting the predicate for the expert testimony through the lay witness testimony. The decision of whether to grant a motion for continuance is in the sound discretion of the trial court. In re Gregory, 313 So. 2d 735, 737 (Fla. 1975). This Court has made clear that it will cautiously review the trial court's decision to deny such a motion and will not reverse the decision unless there has been a palpable abuse of this judicial discretion which clearly and affirmatively appears in the record. Magill v. State, 386 So. 2d 1188, 1188 (Fla. 1980); Cooper v. State, 336 So. 2d 1133, 1138 (Fla. 1976).

To prevail on his motion for continuance, the defendant was required to show: (1) prior due diligence to obtain the witness's presence; (2) that substantially favorable testimony would have been forthcoming; (3) that the witness was available and willing to testify; and (4) that the denial of the continuance caused

material prejudice.  Geralds v. State, 674 So. 2d at 99 (citing United States v. O'Neill, 767 F.2d 780, 784 (11th Cir. 1985)).

On the requirement of prior due diligence, the defense admitted that it did not use the proper subpoena to ensure that the witnesses traveled from Georgia to provide testimony on the date scheduled for their testimony.  The trial court gave a full day in between the guilt and the penalty phase to allow both sides to resolve any issues with witness availability.  Despite this, the defense witnesses were not available to testify.  In rejecting the defense's motion for a continuance, the trial court offered the defense an opportunity to allow its investigator to travel to Georgia to pick up the witnesses and bring them to court or, alternatively, to live stream their testimony from a facility in Georgia.  Had the defense done its due diligence, the trial court could have been made aware of the possibility that Middleton's relatives could not travel, and these same arrangements could have been made a day prior, without the need for a continuance.

As to the second, third, and fourth requirements, the denial of the motion did not prevent the jury from hearing the testimony of the relatives, and there is no indication that the defense was materially prejudiced.  It only required the jury to hear this evidence after the expert witness testimony.  Additionally, the expert witness essentially provided general details about the defendant's childhood, which were corroborated by the relatives' testimony.  Although the defense may have

been inconvenienced by the denial of the motion because it preferred for the relatives to testify before the experts, the denial of the continuance did not prevent the jury from hearing the testimony. Therefore, the trial court did not abuse its discretion in denying Middleton's motion for a continuance.

### E. Denial of Defense's Request for a Mitigation Specialist

Middleton argues that the trial court abused its discretion in denying the defense funds to appoint a mitigation specialist. The appointment of experts is within the trial court's discretion. San Martin v. State, 705 So. 2d 1337, 1347 (Fla. 1997). A trial court's denial of funds to an indigent defendant for appointment of an expert will not be disturbed unless there has been an abuse of discretion. Id. Florida appellate courts use a two-part test to evaluate an alleged abuse of discretion: (1) whether the defendant made a particularized showing of need; and (2) whether the defendant was prejudiced by the court's denial of the motion requesting the expert assistance. Id. If such a request is denied, and not later renewed by the party asserting the need, it is waived. Id.

On October 28, 2010, the parties attended a hearing where the trial court granted the defense's motions to appoint co-counsel and a fact investigator. In appointing the investigator, the trial court stated that "in a death penalty case with issues of mitigation, it's almost self-evident" why the defense would need an investigator. The very next motion that the trial judge heard in that proceeding was

the defendant's motion to appoint a mitigation specialist. The State objected to the motion, stating that an expert was not needed to do the type of investigations that a mitigation specialist is expected to do.

The trial court denied the motion pursuant to <u>Leon Shaffer Golnick Adver., Inc. v. Cedar</u>, 423 So. 2d 1015 (Fla. 4th DCA 1982), stating that the defense was asking him to disregard an administrative order from the chief judge of the circuit, which set a maximum hourly rate for specialists on the case, "based on nothing other than representations of counsel" that the mitigation specialist's work would not be "duplicative of [the investigator just appointed]." The trial court refused to appoint a mitigation specialist because the defense did not demonstrate a particularized need or showing for one. Therefore, the trial court denied the motion without prejudice and invited the defense to set a hearing on the motion in the future when it could demonstrate a particularized need.

The trial court did not abuse its discretion in denying the defense's motion to appoint a mitigation specialist. The defense did not demonstrate a particularized need for the mitigation specialist, in light of its having been granted the appointment of an experienced investigator. The defense claims that only the mitigation specialist can explain how his or her responsibilities are different from those of a fact investigator. This argument is not persuasive. Although a mitigation specialist can best explain his or her capabilities and strategy, the

attorney requesting the services should at the very least be able to provide the court with an explanation of what the mitigation specialist is expected to provide that the fact investigator may not. Without this explanation, the defense is requesting for the court to provide state funds for the defense to conduct what may very well be the gathering of information cumulative to that gathered by the court-appointed fact investigator.

Middleton's reliance on Ake v. Oklahoma, 470 U.S. 68 (1985), is misplaced. In Ake, the Supreme Court reversed because the state court did not provide the defendant expenses for a psychiatric evaluation to assess his sanity at the time of the crime. Id. Importantly, in that case, the defendant was initially declared incompetent to stand trial. Id. Therefore, the Supreme Court determined that the defendant was entitled to a psychiatrist once he made a preliminary showing that his sanity at the time of the offense was likely to be a significant factor at trial. Id.

In this case, Middleton was evaluated by four different doctors and was also appointed a fact investigator. Additionally, during the hearing on Middleton's motion to appoint a mitigation specialist, the defense told the court that it would come back a few months before the trial to request the appointment of a mitigation expert, and the court invited the defense to do so. The defense never renewed the motion. If at any point the defense could specifically demonstrate how a mitigation specialist was imperative to its case, in addition to the other previously

provided experts, the defense could have set a hearing on the motion that had already been filed.   Because error has not been demonstrated, we deny relief on this claim.  Although we find no abuse of discretion in this case, we note that it may be appropriate in other cases for a trial court to grant the defense's request to appoint a mitigation specialist.

### F.  Individualized Sentencing Requirement

Middleton raises numerous claims to support his argument that the trial court did not perform the individualized sentencing required for death penalty cases.   He first claims the trial court improperly and arbitrarily rejected findings of medical experts, and cites Nowitzke v. State, 572 So. 2d 1346 (Fla. 1990), for support.  In Nowitzke, however, this Court reiterated that it is improper for the prosecution to discredit the insanity defense, as a legal defense, in front of the jury.  Id. at 1355. No defense of insanity was made in this case, and no argument based on Nowitzke was made.  Instead the defense argues for a new penalty phase claiming the trial judge denigrated the field of psychology and rejected the findings of the experts. This argument is based on the trial court's agreement with and citation to the dissent in United States v. Byers, 740 F.2d 1104 (D.C. Cir. 1984), where the dissenting judge commented on the imprecision of the science of psychiatry. Despite this agreement, the trial court evaluated the testimony of all of the experts

who testified about the defendant's mental status and determined that Dr. Leporowski was more credible. Relief on this issue is not warranted.

Middleton additionally claims that the trial court used a strawman argument to denigrate the defense's mitigation. See Consalvo v. State, 697 So. 2d 805, 814-15 (Fla. 1996) (explaining that a strawman argument is one where the prosecutor creates an issue not raised by the defense then proceeds to knock it down). In this case, the trial court did not manufacture an argument for the purpose of using the testimony regarding Middleton's psychological state. The defense argued and the trial court considered the mitigating factor of substantial impairment. The psychological data the trial court used to find that Middleton was not impaired was previously presented to assess Middleton's mental state, and the two experts that testified during the penalty phase were repeatedly questioned about those reports and asked to compare their findings to the reports of the nontestifying doctors. The trial court considered the entire record of proceedings where Middleton's psychological capacity was concerned. This strawman argument has no merit. See Perez v. State, 919 So. 2d 347, 374 (Fla. 2005) (determining that the trial court was allowed to use in-court testimony and an expert's report, which was admitted into evidence during the Spencer hearing, to conclude that the mitigator of inability to conform conduct to the requirements of the law was not established).

Middleton next claims that the trial court improperly rejected mitigating evidence of impaired capacity. The trial court provided a thorough explanation of why it was rejecting the statutory mitigator that defendant's ability to conform his conduct to the requirements of the law was substantially impaired.[7] The trial court compared the testimony of Dr. Barnard, who determined that the defendant was not "substantially impaired," to the testimony of Dr. Leporowski, who stated that she saw no evidence that the defendant was suffering from a mental disorder and noted that the defendant made rational decisions on the night of the murder. After considering the record, the trial court determined that the statutory mitigator did not exist. See Walker v. State, 707 So. 2d 300, 318 (Fla. 1997) (contradictory evidence on mitigating factor supports trial court's conclusion that factor did not exist). Relief on this claim is denied.

Middleton further claims the trial court used the wrong standard in evaluating his abusive childhood and abused its discretion in assigning weight to this mitigation, citing Mines v. State, 390 So. 2d 332 (Fla. 1980), and Campbell v. State, 571 So. 2d 415 (Fla. 1990), receded from on other grounds by Trease v.

_____

7. Middleton also argues the trial court should have evaluated the evidence as nonstatutory mitigation. It is clear from the trial court's discussion that consideration was given to substantial impairment, significant impairment, and impairment, and the court found none had been demonstrated. It should also be noted that the trial court used the mental health and drug use evidence to support other nonstatutory mitigation.

State, 768 So. 2d 1050 (Fla. 2000), as support. Both Mines and Campbell stand for the proposition that once a trial court determines that a defendant is not insane, it must still consider the statutory mental mitigating factors. Campbell, 571 So. 2d at 418-19; Mines, 390 So. 2d at 337. The trial court below did not reject the statutory mental mitigators after finding Middleton to be sane; it rejected them after a reasoned analysis comparing the findings of the mental health experts who evaluated him. To the extent that Middleton argues that the trial court erred in using the sanity standard to reject the nonstatutory mental mitigation and assigned it improper weight, this Court addressed this issue in Consalvo. In that case, this Court found that where the trial court would have likely accorded a mitigating circumstance the same amount of weight had it used a different standard, the defendant's claim should be denied. 697 So. 2d at 818-19. The trial court incorporated its analysis from the order on Middleton's motion to suppress his confession and additionally referred to Dr. Leporowski's finding that the defendant was thinking rationally on the night of the murder. Therefore, it is not likely that a different standard of review would have changed the trial court's ruling on this issue.

### G. Admission of Middleton's Confession Video

Middleton's motion to suppress his confession contained three general allegations: (1) that the defendant's statements were illegally obtained because the

consumption of drugs and alcohol caused him to become incompetent to proceed with the interview process, invalidating his waiver of his rights; (2) that the defendant does not have the intellectual ability to adequately comprehend his Miranda rights in order to knowingly and intelligently waive them; and (3) that the final interview was conducted after the defendant was represented by counsel and after his court-appointed counsel filed his Invocation of Constitutional Rights form with the clerk on July 30, 2009, at 11:28 a.m. The trial court in the order on the motion specifically addressed each allegation, and denied the motion. Middleton now claims that the admission of this evidence into his trial was error, based on the same claims raised in his pretrial motion.[8] We conclude that the motion to suppress was properly denied.

A trial court's decision to deny a motion to suppress comes to this Court cloaked with a presumption that its factual findings are correct, but we apply a de novo standard of review to legal issues and mixed questions of law and fact which ultimately determine constitutional issues. Smithers v. State, 826 So. 2d 916, 924-25 (Fla. 2002). When considering the validity of a confession, this

---

8. Defense counsel raised a standing objection to anything that would involve the motion to suppress the confession, including but not limited to interviews of the defendant. The jury was provided with an edited transcript that had been approved by both parties to refer to as they watched the interviews. Jurors were notified that the transcripts were not evidence and would be collected once the video was over.

Court considers the totality of the circumstances surrounding the defendant's confession. Lukehart v. State, 776 So. 2d 906, 920 (Fla. 2000).

In Traylor v. State, 596 So. 2d 957 (Fla. 1992), this Court stated that under the Florida Constitution,

> if the suspect indicates in any manner that he or she does not want to be interrogated, interrogation must not begin or, if it has already begun, must immediately stop. If the suspect indicates in any manner that he or she wants the help of a lawyer, interrogation must not begin until a lawyer has been appointed and is present or, if it has already begun, must immediately stop until a lawyer is present. Once a suspect has requested the help of a lawyer, no state agent can reinitiate interrogation on any offense throughout the period of custody unless the lawyer is present, although the suspect is free to volunteer a statement to police on his or her own initiative at any time on any subject in the absence of counsel.
>
> A waiver of a suspect's constitutional rights must be voluntary, knowing, and intelligent, and, where reasonably practical, prudence suggests it should be in writing. . . . [A]ny statement obtained in contravention of these guidelines violates the Florida Constitution and may not be used by the State.

Id. at 966 (footnotes omitted).

A defendant who has "expressed his desire to deal with the police only through counsel is not subject to further interrogation until counsel has been made available to him, unless the accused has himself initiated further communication, exchanges, or conversations with the police." Edwards v. Arizona, 451 U.S. 477, 484-85 (1981). It does not appear that the trial court abused its discretion in denying Middleton's motion to suppress his confession. The trial court determined

that the office where the confession occurred was a standard office, and not an

interrogation room or any other

> particularly threatening or intimidating venue. The defendant did not
> appear to be under the influence of drugs or alcohol. His speech was
> clear and coherent. His answers are fairly responsive to the questions
> asked. He was capable of articulating thoughts, giving directions and
> describing events. More importantly, the video tape confirms and
> corroborates fully the testimony of Captain John Rhoden, Lieutenant
> Brad Stark, Detective Marty Faulkner and Dr. Deborah Lep[o]rowski.
> It is more difficult to reconcile the videotape with the testimony of
> Drs. James B[a]rnard and Michael Riordan.

These findings are supported by the record.

The trial court also determined that, based on the testimony of Middleton's

friend, Britnell, and the officers who encountered Middleton on the night of the

murder, he did not appear to be so influenced by drugs and alcohol as to be

incoherent or not understand that he was waiving his right to remain silent. The

trial court also observed that of the four psychologists who evaluated Middleton,

Dr. Leporowski appeared to have been the most thorough; she reviewed all of the

records and gave the most reasonable explanation for the discrepancies between

the doctors on the issue of Middleton's capacity to knowingly and voluntarily

waive his right.

As to the defendant's claim regarding the invocation of rights form filed by

the attorney, the trial court observed that it is clear from the record that

Middleton's invocation of rights form had not been executed or served on law

enforcement prior to the defendant's last interview. The written invocation of rights was filed in the court file at 11:28 a.m. on July 30, 2009, and served on the Sheriff's Office that afternoon after the defendant's last interview, which was conducted that morning at approximately 9:24 a.m.

The trial court's finding that Middleton initiated contact with Detective Faulkner is also supported by the record. It is clear from the record that Middleton initiated the final interview with Detective Faulkner, understood that he had the right to remain silent, and voluntarily chose to waive it. At the beginning of the fourth interview, the defendant was reminded of his Miranda rights. He continued to blame Wade Fowler; he was arrested minutes later. When Detective Faulkner arrived at the Sheriff's Office on July 29, 2009, at approximately 11 a.m., he was notified that Middleton was requesting to speak to him again. The recording began at 12:35 p.m. On the recording, Detective Faulkner confirmed that Middleton had in fact requested to speak to him and that Middleton had not yet been to first appearance. Detective Faulkner read Middleton his Miranda rights and Middleton waived his right to remain silent. After initially asking why a different man was not in jail, Middleton began to ramble about clearing his conscience and getting his life together. The detectives repeatedly asked him not to waste their time. Middleton began to explain the events of the day, including drug use. He explained that he and Steve Britnell went to someone's house and did OxyContin

and smoked methamphetamine. He did not remember what time he went to the victim's trailer, only that it was less than twenty minutes after Fowler and Britnell went to Walmart. He stated that he knocked on the victim's door and things just went "crazy." He described the events as "foggy." When Detective Faulkner followed up with a question about how long Middleton was at the victim's trailer before the altercation occurred, Middleton stated that he did not want to talk anymore and requested to go back to his cell. Detective Faulkner immediately states, "The time is now 12:58 P.M., concluding the interview with Dale."

Faulkner testified that he went over to the jail the next day, July 30, to check on Middleton because he was so distraught the night before. He stated that upon seeing him at the jail, Middleton requested to speak to him again. Detective Faulkner immediately had one of the corrections officers escort Middleton to his office. The Sheriff's Office and the jail are connected, with the distance from Faulkner's office and the jail being approximately fifty yards. The jury reviewed the January 30, 2009, recording of Middleton's interview, along with a transcript. The video begins with Detective Faulkner confirming that it was Middleton who initiated the interview. Middleton informs Faulkner during the interview that he had been to first appearance that morning and was told not to talk to anyone. Faulkner told him that they could not speak unless he specifically decided to speak without his attorney being present. Faulkner repeatedly asked Middleton if he was

sure that he wanted to talk without his attorney present; Middleton responded that he did. Faulkner read Middleton his <u>Miranda</u> rights again. Middleton again waived his right to remain silent. Middleton insisted on speaking with Faulkner to clear his head and get past what happened. Thereafter, Middleton confessed to the murder of the victim and the theft of her television.

When Detective Maerki entered the room, he inquired whether Middleton had been to first appearance, to which Middleton replied that he had. He also inquired whether Middleton had requested to speak to him and Faulkner, to which Middleton also replied in the affirmative. Throughout the entire interview, Middleton repeatedly offered information, stating that he wanted everything to be over with because the murder that he committed was out of character; he resisted the offer to have counsel present, and he agreed to assist in the investigation.

It is clear from the record that Middleton initiated contact with Detective Faulkner, rendering his subsequent interview valid under <u>Edwards v. Arizona</u>. Additionally, the requirements of <u>Traylor</u> have been met in this case where the detectives immediately stopped the interview at Middleton's request, and only resumed their conversation with him on his prompting. The trial court properly denied the defendant's motion to suppress the videotaped confession.

## H. Sufficiency of the Evidence

Middleton argues that the trial court erred in denying his motion for judgment of acquittal, claiming that the State failed to present sufficient evidence to support Middleton's convictions for first-degree premeditated murder and first-degree felony murder. After the State rested in the guilt phase, the defense moved for a judgment of acquittal, claiming that the State had not proven that the murder was premeditated in nature, only that it was committed during a robbery. The State responded by pointing out that Middleton stabbed the victim thirty-five times. The trial court denied the motion finding the threshold for submission of the case to the jury had been surpassed because of the totality of the evidence, including DNA evidence, blood spatter evidence, the number of stab wounds, the nature of the wounds, and Middleton's arming of himself prior to going to the victim's trailer.

The defense also moved for a judgment of acquittal as to the burglary count, claiming that Middleton was invited into the trailer and stating that the State did not prove that Middleton intended to commit the theft of the television before he entered the trailer. The State responded that Middleton said the victim told him to leave and attempted to remove him from the trailer, thus withdrawing any consent to enter that was initially given. The State also argued that it did not have to prove intent to commit theft because it could proceed on the theory that the defendant remained in the home with the intent to commit murder, which he ultimately

committed. The trial court denied the motion for acquittal on these grounds. The defense then notified the court that, based on the court's decision on the motion for judgment of acquittal on the burglary charge, the defense had no argument as to the motion for judgment of acquittal on felony murder, which was predicated on the burglary. We affirm the denial of the defendant's motion for judgment of acquittal.

The evidence in a capital case is judged to be sufficient when it is both competent and substantial. See Phillips v. State, 39 So. 3d 296, 308 (Fla.), cert. denied, 562 U.S. 1010 (2010). This Court has an obligation to independently review the record to determine whether sufficient evidence exists to support Middleton's convictions. Id. This Court must "view the evidence in the light most favorable to the State to determine whether a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt." Rodgers v. State, 948 So. 2d 655, 674 (Fla. 2006) (citing Bradley v. State, 787 So. 2d 732, 738 (Fla. 2001)). Further, "[a] general guilty verdict rendered by a jury instructed on both first-degree murder alternatives may be upheld on appeal where the evidence is sufficient to establish either felony murder or premeditation." Crain v. State, 894 So. 2d 59, 73 (Fla. 2004).

The jury was instructed on both premeditated and felony murder, and the jury found Middleton guilty on a special verdict form listing both felony murder and premeditated murder; the jury found him guilty of both.

> "Premeditation is defined as more than a mere intent to kill; it is a fully formed conscious purpose to kill. The purpose may be formed a moment before the act but must exist for a sufficient length of time to permit reflection as to the nature of the act to be committed and the probable result of the act." Premeditation may be inferred from such facts as "the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted."

Hall v. State, 107 So. 3d 262, 281 (Fla. 2012) (emphasis added) (footnotes omitted) (quoting Bradley, 787 So. 2d at 738; Norton v. State, 709 So. 2d 87, 92 (Fla. 1997)), cert. denied 134 S. Ct. 203 (2013).

Here, sufficient evidence exists to support a conviction for premeditated first-degree murder and first-degree felony murder. The defendant went to his neighbor's trailer armed with a knife. When she would not give him money and attempted to get him out of her trailer, the defendant attacked her with the knife. The medical examiner testified that the forensic evidence indicated a struggle between the victim and the defendant that began in the kitchen, and that drag marks indicated that the victim was alive and moving erratically as she was dragged from the kitchen area to the bedroom. The medical examiner also said there were several passes of a sharp instrument to create the margin of the wound,

such as a sawing motion. The blood stains indicated that her carotid artery was not cut until she got into the bedroom. The amount and pattern of blood on the victim's waistband indicates that she may have been sitting up slightly or halfway when she received the neck injury. The victim's shirt was pulled upwards toward her neck, which is consistent with being dragged. The victim had a bruise on her cheek that was consistent with the tread and design of Middleton's boots. The victim had bruises and a cut to her face, a puncture and stab wounds on her chest, neck, ear, and arms. The victim had defensive wounds that indicated that she was trying to get away from someone who had a knife. The autopsy revealed that the neck injury occurred toward the end of the attack. There was sufficient evidence that the defendant committed the homicide with a premeditated design to effect the death of Mrs. Christensen. See Hall, 107 So. 3d at 281.

There is also sufficient evidence of felony murder. In Bradley v. State, 33 So. 3d 664 (Fla. 2010), this Court determined that a conviction for felony murder will stand where the State can show that, even if the defendant was invited into the home by an occupant, the consent was expressly revoked prior to the defendant's opportunity to begin the attack on the victim. Id. at 683. In this case, Middleton explained that he and Wade Fowler had been discussing the crime for a few days because they were experiencing "hard times." Middleton asked the victim to loan him money, but she said she did not have any money because she paid the bills.

He stated the victim got scared and tried to push him out of her trailer. Middleton pulled out the knife he brought with him, and the attack ensued. Thereafter, Middleton took the victim's television, which he later sold for $200. Under these facts, even if the victim invited Middleton into her kitchen, as he claimed, that consent was clearly revoked when the victim attempted to get Middleton out of her home, and when she struggled with him down the hallway before he ultimately cut her throat in the bedroom.

## I. Section 921.141(5)(i), Florida Statutes (2009)

Middleton claims that the CCP aggravator is unconstitutionally vague and overbroad, is incapable of a constitutionally narrow construction and has been and is being applied in an arbitrary and inconsistent manner. He also claims that the standard jury instruction administered in this case did not require that the State prove beyond a reasonable doubt an intent to kill before the crime began, and is therefore unconstitutional. We deny relief as this Court has on numerous occasions upheld the constitutionality of this aggravating factor and the standard jury instruction against similar claims. See, e.g., McWatters v. State, 36 So. 3d 613, 643 (Fla. 2010); Donaldson v. State, 722 So. 2d 177 (Fla. 1998); Hunter v. State, 660 So. 2d 244 (Fla. 1995).

## J. Jury Instructions

Middleton claims that the jury instruction stating that the jury must only consider mitigation after it is "reasonably convinced" of its existence is improper. More specifically, he claims that it violates separation of powers for the judiciary to place a limitation on the consideration of mitigation that the legislature has not specifically placed in the statute. We deny relief because these specific challenges have been raised and rejected by this Court in a number of cases. See Salazar v. State, 991 So. 2d 364 (Fla. 2008); Johnson v. State, 969 So. 2d 938 (Fla. 2007); Bogle v. State, 655 So. 2d 1103 (Fla. 1995); Walls v. State, 641 So. 2d 381 (Fla. 1994).

## K. Section 921.141 (5)(d), Florida Statutes (2009)

Middleton argues that the felony murder aggravator is facially unconstitutional because (1) it does not genuinely narrow the class of persons eligible for the death penalty, and (2) it does not reasonably justify the imposition of a more severe sentence compared to others found guilty of murder. As support for his argument, Middleton cites the decisions of three other state supreme courts that have declared this aggravator to be improper, and urges this Court to follow those courts, and do the same. We again reject Middleton's argument on this issue.

In Mills v. State, 476 So. 2d 172 (Fla. 1985), this Court rejected the argument that Middleton makes here, stating that "[t]he legislative determination that a first-degree murder that occurs in the course of another dangerous felony is

an aggravated capital felony is reasonable." Id. at 178 (citing State v. Dixon, 283 So. 2d 1, 9 (Fla. 1973)); see also Blanco v. State, 706 So. 2d 7, 11 (Fla. 1997) ("Eligibility for this aggravating circumstance is not automatic: The list of enumerated felonies in the provision defining felony murder is larger than the list of enumerated felonies in the provision defining the aggravating circumstance of commission during the course of an enumerated felony. . . . This scheme thus narrows the class of death-eligible defendants. We find no error." (citations omitted) (footnotes omitted)); see also Blanco v. McNeil, No. 07-61249-CIV, 2010 WL 9098788 at *9 (S.D. Fla. Dec. 7, 2010) (rejecting Blanco's claim that felony murder aggravator was unconstitutional (citing Blystone v. Pennsylvania, 494 U.S. 299 (1990))).

## L. Hurst v. Florida

During the pendency of this case, the United States Supreme Court found Florida's death penalty scheme unconstitutional in Hurst v. Florida, 136 S. Ct. 616 (2016). We granted supplemental briefing in which Middleton argued that he is entitled to a new penalty phase. On remand from the United States Supreme Court, we determined that "before a sentence of death may be considered by the trial court in Florida, the jury must find the existence of the aggravating factors proven beyond a reasonable doubt, that the aggravating factors are sufficient to impose death, and that the aggravating factors outweigh the mitigating

- 61 -

circumstances." Hurst v. State, 202 So. 3d 40, 53 (Fla. 2016). We further held that

a unanimous jury recommendation is necessary for the imposition of death and

determined that Hurst error is capable of harmless error review. Id. at 68.

We reject Middleton's argument that he is entitled to a life sentence under

section 775.082(2), Florida Statutes (2012). See Hurst, 202 So. 3d at 63-66. Thus,

the issue before us is whether any Hurst error during Middleton's penalty phase

proceedings was harmless beyond a reasonable doubt. This Court has determined

that Hurst error is evaluated by the following harmless error standard:

> Where the error concerns sentencing, the error is harmless only if
> there is no reasonable possibility that the error contributed to the
> sentence. See, e.g., Zack v. State, 753 So. 2d 9, 20 (Fla. 2000).
> Although the harmless error test applies to both constitutional errors
> and errors not based on constitutional grounds, "the harmless error
> test is to be rigorously applied," [State v.] DiGuilio, 491 So. 2d
> [1129,] 1137 [Fla. 1986], and the State bears an extremely heavy
> burden in cases involving constitutional error. Therefore, in the
> context of a Hurst v. Florida error, the burden is on the State, as the
> beneficiary of the error, to prove beyond a reasonable doubt that the
> jury's failure to unanimously find all the facts necessary for
> imposition of the death penalty did not contribute to Hurst's death
> sentence in this case. We reiterate:

> > The test is not a sufficiency-of-the-evidence, a correct
> > result, a not clearly wrong, a substantial evidence, a more
> > probable than not, a clear and convincing, or even an
> > overwhelming evidence test. Harmless error is not a
> > device for the appellate court to substitute itself for the
> > trier-of-fact by simply weighing the evidence. The focus
> > is on the effect of the error on the trier-of-fact.

> DiGuilio, 491 So. 2d at 1139. "The question is whether there is a
> reasonable possibility that the error affected the [sentence]." Id.

Id. at 68 (last alteration in original). For the error to be harmless, this Court must determine that a rational jury would have unanimously found that there were sufficient aggravating factors that outweighed the mitigating circumstances.

We emphasize the unanimous jury recommendation of death in this case. This unanimous recommendation allows us to determine that, beyond a reasonable doubt, a rational jury would have unanimously found that sufficient aggravating factors outweighed the mitigation. See Davis v. State, 41 Fla. L. Weekly S528, S539-40 (Fla. Nov. 10, 2016). Jurors in Middleton's case heard standard jury instructions informing them that they were to determine sufficient aggravators existed and that aggravation outweighed mitigation before recommending death. See Fla. Std. Jury Instr. (Crim.) 7.11. Jurors were presented with mitigation and informed that they could consider mitigating circumstances of which they were reasonably convinced.

Although the jurors were not informed that they were required to find unanimously that sufficient aggravating circumstances outweighed the mitigation, the jury did recommend death unanimously in this case. We conclude that the jury would have unanimously made the findings necessary to impose death. See Davis, 41 Fla. L. Weekly at S539-40. The extreme aggravation in this case further bolsters our determination that any Hurst error is harmless beyond a reasonable doubt: the trial court found both HAC and during the commission of a burglary

aggravators supported by competent, substantial evidence. These are among the most serious aggravating factors.

We find that the State can sustain its burden of showing that any Hurst error in this case was harmless beyond a reasonable doubt. Although the jury in this case was informed that it was not required to recommend death unanimously, it did so. The unanimous recommendation of death in this case is the sort of recommendation we have determined is constitutionally sufficient to impose a sentence of death. Cf. Davis, 41 Fla. L. Weekly at S539-40. Based on the foregoing, Middleton is not entitled to a new penalty phase.

### III. CONCLUSION

For the reasons stated in this opinion, we affirm Middleton's conviction for first-degree murder and his death sentence.

It is so ordered.

LABARGA, C.J., and PARIENTE, and LEWIS, JJ., concur.
PARIENTE, J., concurs with an opinion, in which LABARGA, C.J., concurs.
CANADY and POLSTON, JJ., concur in result.
QUINCE, J., concurs in part and dissents in part with an opinion.
LAWSON, J., did not participate.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

PARIENTE, J., concurring.

I join the Court's opinion, which affirms Middleton's conviction and death sentence. I write separately to emphasize the importance of a mitigation specialist

to the defense team's investigation and presentation in a capital case and to encourage trial courts to provide defense counsel the assistance of both a mitigation specialist and a fact investigator upon a proper and timely request.

In my view, a trial court should not deny a request for a mitigation specialist either based on the misconception that these specialists are similar to fact investigators or based on undue emphasis on an additional expert "costing too much." It is also important that prosecutors do not add to that misconception by arguing, as the prosecutor did here, that all "a mitigation expert does is synthesiz[e] spankings and timeouts and things of that nature," and "you don't have to be an expert" to "go out and find people who can offer mitigation about . . . bumps [the defendant] got on the head or spankings he got in school or whatever the case might be."[9]

As for the importance of a mitigation specialist, this Court has emphasized that "the obligation to investigate and prepare for the penalty portion of a capital case cannot be overstated—this is an integral part of a capital case." State v. Lewis, 838 So. 2d 1102, 1113 (Fla. 2002). The investigation into mitigation can be

---

9. The prosecutor's sarcastic comments reflect not only a misunderstanding of the effect of early childhood traumas on brain development but also highlight the tendency of some prosecutors to degrade mitigation. Cf. Oyola v. State, 158 So. 3d 504, 512-13 (Fla. 2015) (rebuking prosecutorial arguments that characterize a defendant's mitigating evidence as "excuses," "make-believe," "flimsy," or "phantom").

a monumental undertaking, requiring a significant amount of time that would ideally begin as soon as possible.  See American Bar Association (ABA) Guidelines for the Appointment & Performance of Defense Counsel in Death Penalty Cases (ABA Guidelines), Commentary to Guideline 1.1, reprinted in 31 Hofstra L. Rev. 913, 925 (2003).  The difference between a thorough assessment of mitigation and a cursory one could, quite literally, be a matter of life and death. When funding is properly requested, the defense team should receive the assistance of both a fact investigator and a mitigation specialist to ensure a complete and reliable mitigation investigation.

There is an "apparent widespread use of mitigation specialists or coordinators" in Florida, as the First District Court of Appeal has explained when quashing a trial court order denying a defendant's motion for additional mitigation coordinator fees.  Criminal Specialist Investigations, Inc. v. State, 58 So. 3d 883, 886 (Fla. 1st DCA 2011).[10]  Cases in this Court demonstrate that the use of a mitigation specialist in capital cases is not unusual in Florida.  See, e.g., Turner v. State, 37 So. 3d 212, 219 (Fla. 2010) (noting that a mitigation specialist testified in a capital case); Twilegar v. State, 42 So. 3d 177, 203 (Fla. 2010) (noting that the

_____

10. The issue was before the First District, rather than this Court, because a life sentence was imposed following the penalty phase, and the mitigation specialist was requesting additional compensation for her work in having successfully developed mitigation.

defense counsel had enlisted the assistance of a mitigation specialist in a capital case); Deparvine v. State, 995 So. 2d 351, 360 (Fla. 2008) (noting that a mitigation specialist testified in the penalty phase of a capital case).[11]

The ABA has published guidelines to "set forth a national standard of practice for the defense of capital cases in order to ensure high quality legal representation" for defendants facing a possible death penalty. ABA Guidelines, 31 Hofstra L. Rev. at 919. At the hearing on the motion to appoint a mitigation specialist in this case, the defense counsel urged the trial court to consider the ABA Guidelines, by explaining that these Guidelines "include[] a suggestion, if not a mandatory requirement, that a mitigation specialist . . . should be appointed in death cases because of the nature of the crime and because of the serious nature of the potential penalty." The prosecutor's misguided response was, "I could care less about what they [the ABA] think about the death penalty and how it operates in the State of Florida."

Contrary to the opinion of the prosecutor in this case, the ABA Guidelines do have relevance to capital cases, even if these guidelines are not binding in

---

11. Since at least 2011, mitigation specialists have been recognized as a part of capital cases, when the General Appropriations Act of 2011 set the maximum hourly rate for mitigation specialists at $75. See ch. 2011-69, § 4, at 126, Laws of Fla; see also § 27.425, Fla. Stat. (indicating that the rate specified annually in the General Appropriations Act is the maximum compensation rate in cases in which the court has appointed private counsel or declared a person indigent for costs).

determining whether counsel rendered ineffective assistance. The United States Supreme Court has referred to the various renditions of these guidelines as "guides to determining what is reasonable" for an attorney's performance, or as reflecting "well-defined norms" for attorney conduct. Rompilla v. Beard, 545 U.S. 374, 387 & n.7 (2005); Wiggins v. Smith, 539 U.S. 510, 524 (2003). This Court has also relied upon these guidelines in determining whether trial counsel has adequately investigated mitigation evidence. See, e.g., Parker v. State, 3 So. 3d 974, 984-85 (Fla. 2009) (citing the ABA Guidelines in a postconviction appeal to determine that trial counsel's performance as to investigating and presenting mitigation evidence was deficient); Blackwood v. State, 946 So. 2d 960, 974 (Fla. 2006) (citing the Supreme Court's reliance on the ABA Guidelines in Wiggins in determining that trial counsel unreasonably failed to attempt to present mental health mitigation evidence, and concluding that there was competent, substantial evidence to support the trial court's finding of deficient performance).

A mitigation specialist is "an indispensable member of the defense team throughout all capital proceedings[,] . . . possess[ing] clinical and information-gathering skills and training that most lawyers simply do not have." ABA Guidelines, Commentary to Guideline 4.1, 31 Hofstra L. Rev. at 959. Not only do mitigation specialists have honed skills in gathering and understanding the nature of potential mitigation evidence, such as the significance of early childhood

trauma, but mitigation specialists—unlike the defendant's lawyer—can testify in the penalty phase to impart the results of their mitigation investigation to the jury that must weigh the mitigation and aggravation in determining whether to recommend the death sentence.

As opposed to fact investigators, mitigation specialists "are generally trained in the social sciences, with college degrees in social work or psychology," and "are adept at gathering institutional records, interviewing lay and professional people, and compiling case histories."  Hon. Helen G. Berrigan, The Indispensable Role of the Mitigation Specialist in a Capital Case: A View From the Federal Bench, 36 Hofstra L. Rev. 819, 827-28 (2008).  "Significantly, they are trained in uncovering family trauma and screening for often subtle mental and psychological disorders," and are "experienced in interpersonal communication so they know how to develop trust and rapport with even the most difficult or distrustful of individuals."  Id. at 828 (footnote omitted).  Part of the mitigation specialist's job is to "conduct a comprehensive life history investigation of the client and identify all relevant mitigation issues."  Richard G. Dudley Jr. & Pamela Blume Leonard, Getting It Right: Life History Investigation as the Foundation for a Reliable Mental Health Assessment, 36 Hofstra L. Rev. 963, 966 (2008) (footnote omitted).

A mitigation specialist has the potential to benefit a criminal defendant in a

capital case in a wide variety of ways, as summarized by the commentary to

Guideline 4.1 of the ABA Guidelines:

> They have the time and the ability to elicit sensitive, embarrassing and
> often humiliating evidence (e.g., family sexual abuse) that the
> defendant may have never disclosed.  They have the clinical skills to
> recognize such things as congenital, mental or neurological
> conditions, to understand how these conditions may have affected the
> defendant's development and behavior, and to identify the most
> appropriate experts to examine the defendant or testify on his behalf.
> Moreover, they may be critical to assuring that the client obtains
> therapeutic services that render him cognitively and emotionally
> competent to make sound decisions concerning his case.
> . . . The mitigation specialist compiles a comprehensive and well-
> documented psycho-social history of the client based on an exhaustive
> investigation; analyzes the significance of the information in terms of
> impact on development, including effect on personality and behavior;
> finds mitigating themes in the client's life history; identifies the need
> for expert assistance; assists in locating appropriate experts; provides
> social history information to experts to enable them to conduct
> competent and reliable evaluations; and works with the defense team
> and experts to develop a comprehensive and cohesive case in
> mitigation.
> The mitigation specialist often plays an important role as well
> in maintaining close contact with the client and his family while the
> case is pending.  The rapport developed in this process can be the key
> to persuading a client to accept a plea to a sentence less than death.

ABA Guidelines, Commentary to Guideline 4.1, 31 Hofstra L. Rev. at 959-60

(footnotes omitted); see also ABA Supplementary Guidelines for the Mitigation

Function of Defense Teams in Death Penalty Cases (2008), reprinted in 36 Hofstra

L. Rev. 677, 682 (2008) (explaining that mitigation specialists are skilled

interviewers who can identify and locate relevant persons, recognize and elicit

information related to mental health, establish a rapport with witnesses, and "advise counsel on the appropriate mental health and other expert assistance").

The importance of appointing a mitigation specialist becomes all the more evident in a case involving an indigent defendant, where the trial court appoints private counsel, who generally does not have the same institutional resources as the Public Defender's Office. In such cases, the trial judge effectively decides "what financial assistance, investigators, or experts the defense will be allowed." Berrigan, 36 Hofstra L. Rev. at 823. "By controlling the purse strings, the trial judge effectively controls the quantity and quality of information that will flow to the jury if a penalty phase is necessary." Id. As the Eleventh Circuit Court of Appeals has stated, "[p]ermitting an indigent capital defendant to introduce mitigating evidence has little meaning if the funds necessary for compiling the evidence [are] unavailable." Westbrook v. Zant, 704 F.2d 1487, 1496 (11th Cir. 1983), overruled on other grounds by Peek v. Kemp, 784 F.2d 1479, 1494 (11th Cir. 1986).

Accordingly, given the importance of a mitigation specialist to the defense's presentation in a capital case, I strongly encourage trial courts to liberally grant proper requests for mitigation specialists. Nevertheless, I would not find reversible error in this case because the defense lawyer expressly stated that he would renew his request for a mitigation specialist, but he did not do so. Further, in this direct

appeal, Middleton is unable to show how he was prejudiced. I therefore concur in the affirmance of the conviction and death sentence.

LABARGA, C.J., concurs.

QUINCE, J., concurring in part and dissenting in part.

I concur with the majority's findings that the evidence here is sufficient to sustain Middleton's convictions. I disagree with the majority's finding that the Hurst error was harmless beyond a reasonable doubt for the same reasons set forth in Justice Perry's partial concurrence in Davis v. State, 41 Fla. L. Weekly S528, S540-41 (Fla. Nov. 10, 2016) (Perry, J., concurring in part and dissenting in part). The jury's unanimous recommendation of death in this case does not enable this Court to conclude beyond a reasonable doubt that the jurors would have made all the findings necessary for the imposition of death unanimously. Just as this Court declined to speculate as to how the jurors would have voted in Hurst v. State, 202 So. 3d 40, 69 (Fla. 2016), so too should we decline to speculate in this case. I conclude that the error here was harmful.

An Appeal from the Circuit Court in and for Okeechobee County,
    Robert Eugene Belanger, Judge - Case No. 472009CF000448CFAXMX

Carey Haughwout, Public Defender, and Jeffrey L. Anderson, Assistant Public Defender, Fifteenth Judicial Circuit, West Palm Beach, Florida,

    for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; and Lisa-Marie Lerner, Assistant Attorney General, West Palm Beach, Florida,

for Appellee