DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**ZACHARY JOSEPH PENNA,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D2020-0345

[April 30, 2025]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Caroline C. Shepherd, Judge; L.T. Case No. 502016CF006304A.

Daniel Eisinger, Public Defender, and Paul Edward Petillo, Assistant Public Defender, West Palm Beach, for appellant.

James Uthmeier, Attorney General, Tallahassee, and Heidi L. Bettendorf, Senior Assistant Attorney General, West Palm Beach, for appellee.

**ON REMAND FROM THE SUPREME COURT OF FLORIDA**

ARTAU, J.

The Fifth Amendment provides that "[n]o person shall be . . . compelled in any criminal case to be a witness against himself." The Supreme Court of the United States has held that "the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored." *Miranda v. Arizona*, 384 U.S. 436, 467 (1966). But *Miranda* rights "are prophylactic rules" that, while "constitutionally based," are not found in the text of the Constitution or the historical, common law right against self-incrimination. *Vega v. Tekoh*, 597 U.S. 134, 142 (2022) (quoting *Dickerson v. United States*, 530 U.S. 428, 440 (2000)) (discussing the prophylactic nature of *Miranda* rights); *see also Miranda*, 384 U.S. at 510 (Harlan, J., dissenting) ("Historically, the privilege against self-incrimination did not bear at all on the use of extra-legal confessions.").

Thus, the Supreme Court has stated that the proper test for determining whether *Miranda* rights have been validly waived after a suspect has invoked them is a two-part test that requires courts to examine "the totality of the circumstances, including the necessary fact that the accused, not the police, reopened dialogue with the authorities." *Oregon v. Bradshaw*, 462 U.S. 1039, 1046 (1983) (plurality opinion) (quoting *Edwards v. Arizona*, 451 U.S. 477, 486 n.9 (1981)).

In *Shelly v. State*, our supreme court, however, added to this test by requiring the suspect to be readvised of his *Miranda* rights before his waiver can be held valid. 262 So. 3d 1, 13 (Fla. 2018), *receded from in State v. Penna*, 385 So. 3d 595, 602 (Fla. 2024). This court then applied the *Shelly* rule in *Quarles v. State*. *See generally* 290 So. 3d 505 (Fla. 4th DCA 2020), *disapproved by Penna*, 385 So. 3d 595.

When we first considered Zachary Joseph Penna's ("Penna") appeal from his first-degree premeditated murder convictions for the stabbing deaths of two men and his various other convictions for the crimes he committed during his flight from the scene of the murders, a majority of this court reversed Penna's resulting convictions based on the conclusion that certain post-arrest statements which Penna made to a Brevard County deputy sheriff should have been suppressed and that the error in not suppressing the statements was not harmless. *See Penna v. State*, 344 So. 3d 420, 436-39 (Fla. 4th DCA 2021). The dissent disagreed. *See id.* at 440-42 (Artau, J., dissenting).

On further review, our supreme court quashed this court's majority decision and remanded for reconsideration of the suppression issue. *Penna*, 385 So. 3d at 602. In doing so, our supreme court receded from *Shelly*, disapproved of *Quarles*, and restored the analysis to the *Edwards-Bradshaw* test. *See generally Penna*, 385 So. 3d 595. Having now reconsidered the suppression issue in accordance with the two-part *Edwards-Bradshaw* test, we affirm Penna's convictions in all respects.

## Background

On a single day in November of 2015, Penna went on a crime spree that spanned both Palm Beach and Brevard Counties. He first stabbed two men to death at their home in Greenacres in Palm Beach County. During his flight from the Greenacres crime scene in a vehicle which he stole from the homicide victims' home, he forcibly robbed an elderly woman upon encountering her in Boynton Beach. Penna then drove to the home of a co-worker whom he forced at knifepoint to accompany him in his flight from his crimes. The co-worker managed to escape when Penna later

2

stopped at a McDonald's restaurant. Ultimately, after Penna carjacked a second vehicle in Brevard County and stabbed the owner of that vehicle in the process, Penna was shot four times while being apprehended by law enforcement utilizing a police dog in some woods outside Titusville.[1]

As our supreme court explained in its opinion in this case:

> Following his apprehension, Penna was transported to a nearby hospital where he received medical treatment. The next day, Detective Jonathan D'Angelo [of the Greenacres Police Department] went to the hospital to speak with Penna. At that time, Penna was shackled to his bed and on several medications. Despite his physical condition, Penna was able to communicate with the detective.

> At the outset of their conversation, Detective D'Angelo asked Penna if he had been advised of his *Miranda* rights. In response, Penna began listing those rights, noting the right to silence and an attorney. Despite this, the detective read Penna the *Miranda* warnings listed on his department-issued card.

> Detective D'Angelo then began asking questions related to the murders. Penna answered the first few questions, generally denying that he recognized the murder victims or their home. But when Detective D'Angelo asked Penna how he came to have possession of the stolen SUV, Penna invoked his right to counsel. At that point, Detective D'Angelo stopped questioning Penna and left the room. When another detective entered Penna's room later that day, Penna again invoked his right to counsel.

*Penna*, 385 So. 3d at 598. Detective Johnnie Slack of the Titusville Police Department was the second detective to whom Penna had invoked his *Miranda* rights.

Over the next several weeks, Penna remained hospitalized, restrained to his bed, and guarded by various officers from the Brevard County Sheriff's Office. Deputy Michael Nettles was one of the Brevard County officers assigned to monitor Penna during his hospitalization. Deputy Nettles later testified during Penna's trial about various incriminating

---

[1] Penna's Brevard County crimes are not at issue in this case.

3

statements Penna made during the numerous conversations the two had while Penna was hospitalized and in custody in Brevard County.

*The Challenged Statements*

Penna's conversations with Deputy Nettles took place over the course of five days that spanned from December of 2015 until January of 2016. Penna initiated their on-going dialogue on December 17, 2015. On that date, Penna spontaneously asked the deputy why he (Penna) was in the hospital. Deputy Nettles replied, "You don't know why you are here?" Penna responded by shaking his head, turning away, and closing his eyes. However, about thirty minutes later, Penna spontaneously volunteered to Deputy Nettles that he had "stabbed a couple of people" to which the deputy replied: "You stabbed a couple of people?" At that point, Penna confirmed that he not only had stabbed two men but also had stabbed the police dog deployed by law enforcement into the woods where he was ultimately apprehended.

Two days later, on December 19, 2015, Penna again spontaneously initiated conversation with Deputy Nettles. During this exchange, Penna began by expressing that he was in a bad mood because he felt he had messed up his life. Deputy Nettles responded by asking Penna why he thought he messed up his life. Penna replied: "I know what I did. I'm going to prison for my whole [expletive] life."

The next day, on December 20, 2015, Penna and Deputy Nettles were again engaged in conversation about various topics when Penna spontaneously asked the deputy: "What do you think I will get?" When Deputy Nettles asked what Penna meant by that, Penna responded that he was referring to what he might get "for killing" the two men. When Deputy Nettles asked Penna what he thought he was "being punished for," Penna volunteered that he could explain the whole story because it was complicated.

At that point, Deputy Nettles reminded Penna that he was a uniformed law enforcement officer and would write down or type on his laptop anything Penna said. However, Deputy Nettles did not re-*Mirandize* Penna or specifically remind Penna of the scope of his rights consistent with *Miranda*. Deputy Nettles advised Penna that they "could talk" if Penna "want[ed] to have a conversation," but "as far as specific crimes" the deputy was "not going to ask [Penna] specific questions about specific crimes." Penna then gave the deputy a lengthy and specific narrative of how and why he committed the homicides and other crimes, including various details regarding injuries which he sustained during the stabbings and his

4

decision to drink the two men's blood "just because." Penna also shared with Deputy Nettles the specifics surrounding his apprehension and arrest.

On December 25, 2015, Penna again spontaneously asked Deputy Nettles about prison and how much time the deputy thought Penna might get for the crimes he committed. Deputy Nettles responded by asking Penna: "What crime do you think you'll get the most time for?" Penna responded that he thought stabbing the two men and drinking their blood would mean life imprisonment for him. Penna also explained, in response to further inquiry by Deputy Nettles, that he thought running from the police and stabbing the police dog, which he indicated was as bad as stabbing a police officer, were the second worst crimes he committed after the homicides. Penna specifically asked Deputy Nettles if he thought drinking the homicide victims' blood was a serious crime to which the deputy responded that he was unsure whether a sentencing enhancement would be applicable to those crimes. Penna also expressed remorse for having stolen the elderly woman's shirt and purse while admitting he had fled north on I-95 because he knew the police were looking for him.

During their Christmas Day discourse, Deputy Nettles asked Penna, in response to the comments which Penna had made, what guided him in the crimes he committed and whether he had considered turning himself into the police or just stopping his flight and calling for help. Deputy Nettles also responded to questions Penna asked about what prison would be like.

After the holidays, on January 7, 2016, Penna again spontaneously asked Deputy Nettles about prison. After the deputy responded by asking Penna what he thought his sentence might be for his crimes, Penna stated, "I know I will spend life in prison for killing the two guys and for trying to kill the dog and other people." Penna and Deputy Nettles then discussed Penna's belief in having been reborn after surviving being shot four times and his professed belief in the Egyptian god Ra. Penna also explained to Deputy Nettles that he heard voices on the day of the crimes and that "they could say [he was] crazy" as a result. However, Penna also explained to Deputy Nettles that he knew what was going on because he watched plenty of "cop shows."

5

*The Suppression Motion*

Prior to trial, Penna moved to suppress all post-arrest statements he made to law enforcement, including those made to Deputy Nettles. In his motion, Penna detailed the facts surrounding his apprehension by law enforcement, arrest, injuries, and the initial giving of his *Miranda* warnings immediately after his arrest by both Detective D'Angelo and Detective Slack. Penna explained in his motion that Deputy Nettles was among the officers who had been assigned to guard him at the hospital while he recovered from his injuries.

Penna alleged in his suppression motion that, even though Deputy Nettles was told that Penna had invoked his *Miranda* rights, the officer "engaged" Penna in conversations about the crimes while assigned the duty of guarding him in the hospital. Penna's motion sought to suppress all statements "gathered" from Penna by Deputy Nettles after December 17, 2015, on grounds that those statements were obtained after Penna's invocation of his *Miranda* rights.

The State's written response to the suppression motion argued that Penna "began to make unsolicited spontaneous remarks to Deputy Nettles" beginning on December 17, 2015, and continuing over the course of several days during the remainder of that month and into January of 2016. As such, the State argued that all statements Penna made to Deputy Nettles were not in response to renewed interrogation in violation of his prior rights invocation and therefore need not be suppressed.

*The Suppression Hearing*

The trial court conducted a lengthy evidentiary hearing on several pretrial motions, at which testimony on the suppression motion was heard. Detective D'Angelo confirmed in his testimony at the hearing that Penna answered a couple of questions immediately after being given his *Miranda* warnings upon his arrest, but then requested a lawyer at which point all questioning ceased. Detective D'Angelo also confirmed that Detective Slack attempted to interview Penna, but that Penna again invoked his *Miranda* rights in response to that officer's attempted questioning. Deputy Nettles acknowledged in his testimony at the hearing that he was aware of Penna's *Miranda* rights invocation immediately after his arrest having been told this fact by Greenacres detectives on December 17, 2015, when the deputy's interactions with Penna began.

Deputy Nettles testified at the suppression hearing in detail regarding the substance of all statements Penna made during their time together.

6

Deputy Nettles admitted during his testimony that he never gave Penna any *Miranda* warnings either prior to or during any of their various conversations. But Deputy Nettles also explained that he never tried to initiate any conversation with Penna that was specific to his case. Instead, Deputy Nettles explained that Penna initiated all conversations about the circumstances surrounding the commission of the charged offenses and Penna's subsequent apprehension and arrest.

### *The Trial Court's Denial of the Suppression Motion*

The trial court did not immediately rule on the suppression motion at the end of the hearing, but rather took the matter under advisement. Later, on the morning of the first day of trial, the trial court denied Penna's suppression motion as to all post-arrest statements he made to Deputy Nettles. The trial court explained its ruling as follows:

> Deputy Nettles testified that he was in full uniform the entire time, wearing the same uniform that he wore . . . when he testified in court, clearly identifying himself as law enforcement. That he had [a] laptop; not like a cell phone or something small that he could tuck under his leg, but that he had a large regular sized, full size laptop on his lap.

> [Deputy Nettles] reminded [Penna] that he was law enforcement, and that he was going to the [sic] write down or type everything that [Penna] told him. And at one point I think [Deputy Nettles] testified that he had to ask [Penna] to slow down because he couldn't type that fast, and [Penna] slowed down, according to [Deputy Nettles's] testimony.

> I didn't have any evidence to the contrary. There was— there was thorough cross examination. But I didn't receive any evidence to the contrary of what Deputy Nettles testified to. And the key, for me, is the fact that Deputy Nettles did not question him. That *every time there was a conversation it was initiated by* [*Penna*]. And that Deputy Nettles would paraphrase or repeat verbatim what [Penna] had said, but forming it in the—in a question. And then [Penna] would elaborate or would continue and say further things.

> *And sometimes he followed up with questions, but only after [Penna] initiated the conversation.* And each time that there was a renewed conversation it was never at the initiation of law enforcement. And because of that, *all those statements*

7

that [Penna] made are admissible and will be allowed in the State's case.

(Emphasis added).

## *The Trial*

During the presentation of its case, the State established not only the circumstances surrounding Penna's commission of the crimes with which he was charged, but also the circumstances surrounding his apprehension, arrest, and subsequent hospitalization while in custody in Brevard County. Penna's affirmative defense at trial was that he was legally insane at the time he committed the charged offenses. In other words, Penna acknowledged that he committed the criminal acts, but asked the jury to not hold him criminally responsible due to his alleged inability at the time to appreciate the wrongfulness of his conduct. In support of his defense, Penna presented extensive testimony from two mental health experts. In rebuttal, the State presented extensive testimony from its own psychiatric expert indicating that Penna suffered from a personality disorder but was legally sane at the time he committed the charged offenses.

The jury found Penna guilty of all charged offenses, thereby rejecting his insanity defense. The trial court adjudicated Penna guilty of these crimes and sentenced him to two concurrent terms of life imprisonment without the possibility of parole for the homicides, to be followed by consecutive terms of imprisonment for the non-homicide offenses.[2]

## *Our Initial Review*

In his appeal to this court, Penna raised several issues, including that the trial court committed reversible error by denying his suppression motion challenging the admissibility of the post-arrest statements he made to Deputy Nettles. Penna also challenged his convictions on grounds that the trial court abused its discretion by not only denying defense counsel's post-verdict request to interview a juror, but also by overruling a discovery violation objection to a state witness's late-disclosed PowerPoint presentation without conducting an adequate *Richardson*[3] hearing. We concluded that these issues were rendered moot by the majority's reversal

---

[2] Prior to trial, the State initially sought, but later abandoned, the death penalty as a possible punishment in this case.

[3] *See generally Richardson v. State*, 246 So. 2d 771 (Fla. 1971).

on the suppression issue. *See Penna*, 344 So. 3d at 440. Penna raised other issues on appeal—"claiming the trial court erred in overruling a 'facts not in evidence' objection during [a defense] psychologist's testimony, in overruling a hearsay objection during the [State's] psychiatrist's testimony, and in denying defense counsel's request to add language to the insanity defense's standard jury instruction"—all of which were determined to lack merit. *Id.*

The State's position on appeal with respect to the suppression issue was that "all of [Penna's] statements to [Deputy Nettles] at the hospital were admissible because [Penna] made the statements spontaneously without prompting or interrogation, and some of those statements occurred during conversations which were not related in any way to the crimes." *Id.* at 431. The State further argued that Deputy Nettles' "decision to memorialize [Penna's] statements on a laptop in front of [him], respond to [Penna's] inquiries, and continu[e] to let him speak without being prompted, did not transform their interactions into interrogations." *Id.*

In reversing, the majority relied on our supreme court's now-receded from decision in *Shelly v. State*, 262 So. 3d 1 (Fla. 2018), as previously interpreted by this court in *Quarles v. State*, 290 So. 3d 505 (Fla. 4th DCA 2020). *See Penna*, 344 So. 3d at 433-34 (discussing *Shelly* and *Quarles*).

On rehearing, we unanimously granted the State's request to certify the following question to our supreme court as being one of great public importance:

> WHETHER A DEFENDANT'S FIFTH AMENDMENT *MIRANDA* RIGHTS ARE AUTOMATICALLY VIOLATED WHEN AN OFFICER FAILS TO RE-READ A *MIRANDA* WARNING FOLLOWING A DEFENDANT'S VOLUNTARY RE-INITIATION OF CONTACT.

*Id.*

*Supreme Court's Discretionary Review*

The Florida Supreme Court accepted review and answered the certified question in the negative by "reced[ing] from [its] decision in *Shelly*," which was characterized as having "announced a per se rule that is inconsistent with [United States] Supreme Court precedent," *Penna*, 385 So. 3d at 597, and specifically disapproving of our decision in *Quarles*. *Id.* at 602 n.6. In reaching this result, our supreme court explained that the proper standard

9

for analyzing the suppression issue in this case requires us to ask only "two things: (1) did [Penna] reinitiate contact with police and, if so, (2) did he knowingly and voluntarily waive his earlier-invoked *Miranda* rights." *Id.* at 602. The supreme court made clear that "[t]he latter inquiry [into whether waiver occurred] turns on the totality of the circumstances." *Id.*

Our supreme court began its analysis by noting that, "to safeguard the Fifth Amendment's right against compelled self-incrimination," *Miranda* requires law enforcement to "advise suspects of certain rights—including the right to silence and counsel—before subjecting them to custodial interrogation." *Id.* at 600. However, our supreme court also explained that, according to the United States Supreme Court's post-*Miranda* decision in *Edwards v. Arizona*, 451 U.S. 477, 483-84 (1981), and plurality opinion in *Oregon v. Bradshaw*, 462 U.S. 1039, 1046 (1983), "[w]hen a suspect unequivocally invokes the *Miranda* right to counsel, the officers must immediately stop questioning the suspect." *Penna*, 385 So. 3d at 600. But our supreme court further explained that an "invocation does not mean that law enforcement may never again question the suspect in a custodial setting." *Id.*

As our supreme court explained, "[v]iewed collectively, *Edwards* and *Bradshaw* establish a two-part test for assessing whether post-invocation statements violate *Miranda.*" *Id.* "First, the defendant must reinitiate contact with police." *Id.* "And second, there must be a valid waiver of the *Miranda* rights already invoked." *Id.* Quoting from *Bradshaw*, our supreme court made clear that the "waiver prong depends 'upon the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused.'" *Id.* (quoting *Bradshaw*, 462 U.S. at 1046).

Our supreme court then explained how *Shelly*'s "remind-or-readvise" requirement became part of Florida's jurisprudence:

> We relied on the[] principles [set forth in *Edwards* and *Bradshaw*] in *Welch v. State*, 992 So. 2d 206 (Fla. 2008). Applying a totality-of-the-circumstances test, we found no *Miranda* violation, specifically noting the factors relevant to our analysis.
>
> Ten years later, [in *Shelly*,] we again considered a situation where the suspect invoked his *Miranda* rights but made subsequent statements. We held that the suspect's post-invocation statements were inadmissible under *Miranda*. In finding that *Miranda* violation, we noted that the suspect did

10

not reinitiate contact with police. Under the *Bradshaw-Edwards* analysis, that conclusion would have been enough for a *Miranda* violation.

But we did not confine our analysis to the re-initiation issue. Instead, we discussed *Bradshaw* and *Welch* at length. Expanding upon those opinions, we established a categorical rule that an accused must either be "reminded" of his *Miranda* rights or "given" them again—we said both.

*Id.* (internal citations omitted).

However, as our supreme court explained, "*Shelly*'s remind-or-readvise requirement is incompatible with" United States Supreme Court precedent because the decision in *Bradshaw* did not create "a legal rule that a suspect must always be reminded of or re-given *Miranda* [warnings] following re-initiation of contact with police." *Id.* at 601 (citing *Shelly*, 262 So. 3d at 22 (Lawson, J., dissenting)). Instead, our supreme court made clear that "*Bradshaw* laid out a two-part test that asked whether the defendant reinitiated contact with police and waived his rights as determined by the totality of the evidence." *Id.* In other words, as our supreme court determined, "*Shelly* improperly expanded *Bradshaw* by adding a new requirement." *Id.*

In concluding that "*Shelly* improperly interpreted Fifth Amendment precedent," our supreme court expressly stated that "the *Bradshaw-Edwards* framework does not include a categorical remind-or-readvise requirement following invocation of *Miranda* rights." *Id.* In fact, our supreme court saw "no support in the text of the [United States] Constitution or in any [United States] Supreme Court precedent that this one factor is determinative of a Fifth Amendment violation." *Id.*

Thus, our supreme court receded from *Shelly*'s "categorical remind-or-readvise requirement" and reiterated that "*Bradshaw* provides the proper standard which should be applied in this case" in determining whether Penna's challenged statements to Deputy Nettles should have been suppressed and not considered by the jury in determining Penna's guilt. *Id.* at 602. The case was then remanded to this court "for reconsideration under the proper standard as stated in this opinion." *Id.*

11

## Remand Analysis

We note that, in analyzing the suppression issue utilizing the proper *Edwards-Bradshaw* two-part test, our standard of review remains unchanged. That is, we "accord a presumption of correctness" to the trial court's findings "of historical facts" but review de novo all "mixed questions of law and fact" in the context of our ultimate determination as to whether a constitutional violation occurred. *Miller v. State*, 42 So. 3d 204, 220 (Fla. 2010) (quoting *Connor v. State*, 803 So. 2d 598, 608 (Fla. 2001)); *see also Middleton v. State*, 220 So. 3d 1152, 1179 (Fla. 2017) ("A trial court's decision to deny a motion to suppress comes to th[e] [appellate] [c]ourt cloaked with a presumption that its factual findings are correct, but we apply a de novo standard of review to legal issues and mixed questions of law and fact which ultimately determine constitutional issues.").

Applying this standard of review, we conclude that Penna's *Miranda* rights were not violated.

### First Prong of Edwards-Bradshaw Test: Reinitiation of Contact

As our supreme court has now explained, we must first determine whether Penna "reinitiate[d] contact" with law enforcement after having previously invoked his *Miranda* rights immediately following his arrest. *Penna*, 385 So. 3d at 602; *see also Herard v. State*, 390 So. 3d 610, 619 (Fla. 2024) (applying *Penna*'s two-part test in determining whether the trial court in a death penalty case properly denied the defendant's motion to suppress statements he made to law enforcement after invoking his *Miranda* rights). In denying Penna's motion to suppress, the trial court determined as a matter of historical fact that "every time there was a conversation" between Penna and Deputy Nettles "it was initiated by [Penna]." In fact, while the trial court found that Deputy Nettles "sometimes" had "followed up with questions," the trial court also found that the officer did so "only after Penna initiated the conversation."

The trial court's factual finding—that Penna reinitiated all conversations with Deputy Nettles—is supported by not only the evidence presented at the suppression hearing, but also Deputy Nettles' descriptions of his interactions with Penna during his trial testimony. *See, e.g., Ross v. State*, 45 So. 3d 403, 414 (Fla. 2010) ("We defer to a trial court's findings of fact as long as they are supported by competent, substantial evidence[.]" (citing *Cuervo v. State*, 967 So. 2d 155, 160 (Fla. 2007)). As a result, with respect to the first prong of the *Edwards-Bradshaw* test, Penna clearly reinitiated all contact between himself and

Deputy Nettles when he made the incriminating statements he sought to suppress.

*Second Prong of Edwards-Bradshaw Test: Waiver*

We also conclude, with respect to the *Edwards-Bradshaw* test's second prong, that the trial court properly determined from "the totality of the circumstances" surrounding Penna's several conversations with Deputy Nettles that Penna "knowingly and voluntarily waive[d] his earlier-invoked *Miranda* rights" as is required for all resulting incriminating statements made by him to the deputy to be both constitutional and admissible. *Penna*, 385 So. 3d at 602. Our standard for determining "voluntariness" in this context—that is, whether the incriminating statements were "the product of free will and rational choice"—"is the same as that which 'applies to federal prosecutions under the Fifth Amendment privilege against self-incrimination.'" *Martin v. State*, 107 So. 3d 281, 298 (Fla. 2012) (alterations omitted) (quoting *Brewer v. State*, 386 So. 2d 232, 235 (Fla. 1980)).

As our supreme court has explained, the determination of whether a defendant has "validly waived" his or her *Miranda* rights "must be ascertained from two separate inquiries." *Ramirez v. State*, 739 So. 2d 568, 575 (Fla. 1999). "First, the relinquishment of the right must have been voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception." *Id.* (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). "Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* (quoting *Moran*, 475 U.S. at 421). "Only if the 'totality of the circumstances surrounding the [interaction] reveal[s] both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Id.* (quoting *Moran*, 475 U.S. at 421).

However, as the United States Supreme Court observed in *Berghuis v. Thompkins*, 560 U.S. 370 (2010), the State "does not need to show that a waiver of *Miranda* rights was express." *Id.* at 384; *see also, e.g., Kalisz v. State*, 124 So. 3d 185, 203 (Fla. 2013) ("[T]he course of decisions since *Miranda* [has] demonstrated that waivers can be established 'absent formal or express statements of waiver.'" (quoting *Berghuis*, 560 U.S. at 383)). Instead, "[a]n 'implicit waiver' of the 'right to remain silent' is sufficient to admit a suspect's statement into evidence." *Kalisz*, 124 So. 3d at 203 (quoting *Berghuis*, 560 U.S. at 384).

Thus, "where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement [made subsequent to the giving of the *Miranda* warning] establishes an implied waiver of the right to remain silent." *Berghuis*, 560 U.S. at 384. As the Supreme Court explained in *Berghuis*:

> Although *Miranda* imposes on the police a rule that is both formalistic and practical when it prevents them from interrogating suspects without first providing them with a *Miranda* warning, it does not impose a formalistic waiver procedure that a suspect must follow to relinquish those rights. As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford.

*Id.* at 385 (internal citation omitted).

Here, the totality of the circumstances surrounding Penna's several interactions with Deputy Nettles, as found by the trial court, included the deputy having always been "in full uniform" with a computer laptop recording the statements which Penna made after he was reminded that the deputy was going to "write down or type everything that [Penna] told him." The circumstances also included, as our supreme court observed in its opinion, Penna expressly "listing [his] rights, noting the right to silence and an attorney," when he was initially asked by Detective D'Angelo, some four weeks before the conversations with Deputy Nettles, whether he knew and understood his *Miranda* rights. *Penna*, 385 So. 3d at 598. Under these circumstances, we conclude that Penna understood the consequences of talking to Deputy Nettles both before and during each of their conversations, and implicitly waived his earlier-invoked *Miranda* rights by speaking to the deputy on each challenged occasion.

In addition, while our supreme court has now made clear that "there is no per se requirement that an officer remind or readvise a defendant of his *Miranda* rights," it also recognized that "evidence of such would certainly be relevant to an overall analysis of whether the defendant voluntarily waived those rights." *Penna*, 385 So. 3d at 602. Here, Deputy Nettles' statements to Penna—that he was a uniformed law enforcement officer who would write down or type on his laptop anything which Penna said— was a sufficient reminder to Penna of his *Miranda* rights, when coupled with Penna's professed knowledge about what was going on from having watched plenty of "cop shows," for all of Penna's subsequent statements

14

to be considered the product of a knowing and voluntary waiver of Penna's previously invoked *Miranda* rights.

As our colleague on the Fifth District Court of Appeal has observed, "[s]ome criminal procedure concepts have become well-known to the general public through television and movies; *Miranda* warnings, *Terry* stops, probable cause, and search warrants immediately come to mind." *Blice v. State*, 825 So. 2d 447, 449 n.3 (Fla. 5th DCA 2002) (Thompson, J., specially concurring). Thus, given the totality of the circumstances surrounding Penna's various incriminating statements to Deputy Nettles, which included Penna's own expressions to the deputy and others of his understanding of his *Miranda* rights, presumably obtained from his viewing of plenty of "cop shows," it strains credulity for Penna to now argue on remand that the State failed to meet its burden of proving at the suppression hearing that he engaged Deputy Nettles in conversation without a full awareness of the nature of the rights which he was abandoning and the consequences of that abandonment.

## Conclusion

Accordingly, we conclude that the trial court appropriately denied Penna's motion to suppress with respect to all post-arrest statements he made to Deputy Nettles. We also conclude without further discussion that the remaining issues Penna raised on appeal, including the issues we previously determined were moot, are without merit and do not require reversal. We therefore affirm Penna's convictions and resulting sentences in all respects.

*Affirmed.*

WARNER and GERBER, JJ., concur.

\*         \*         \*

**Not final until disposition of timely filed motion for rehearing.**